# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

CORALYN GRUBBS, LEWIS SMITH, AL RIVERA, and SEAN MILLER, individually and on behalf of all other persons similarly situated,

                Plaintiffs,

      v.

HOWARD SAFIR, in his official capacity as Police Commissioner of the City of New York; NEW YORK CITY POLICE DEPARTMENT; BERNARD KERIK, in his official capacity as Commissioner of Correction of the City of New York; NEW YORK CITY DEPARTMENT OF CORRECTION; RUDOLPH GIULIANI, in his official capacity as Mayor of the City of New York; and THE CITY OF NEW YORK,

                Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 92-cv-2132
(GBD)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAUSE SEEKING ENFORCEMENT OF THE SETTLEMENT ORDER AND FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## PRELIMINARY STATEMENT

More than 17 years ago, in this case, Judge Chin found that the lack of private rooms for pre-arraignment attorney-client consultation at the Richmond County Criminal Court violated criminal defendants' (the class "Plaintiffs") Sixth Amendment right to counsel: "The assistance of counsel would be rendered meaningless if that counsel's client were to be inhibited from speaking openly and freely." The remedy for this Sixth Amendment violation was resolved through a settlement agreement, which approved and adopted as the judgment of the Court (the "Settlement Order"). The Settlement Order in this case states that: "The City shall use its best efforts to construct or install, by August 31, 1999, an interview booth for pre-arraignment detainees to consult **privately** with counsel in the courthouse at 67 Targee Street, Staten Island, New York." (emphasis added).

Now, 17 years later, the City of New York and the Department of Correction (together, the "City") have used the construction of a new criminal courthouse in Richmond County as an excuse to undermine that critical portion of Settlement Order. Specifically, in the new courthouse, the City has installed cameras in the booths where attorneys consult with clients pre-arraignment. Moreover, the City has informed Plaintiffs' counsel that the cameras will be set to record and that the recordings will be retained by the Department of Correction for 90 days. And while the City has represented that the cameras' audio recording capabilities will be turned off, this does not solve the problem. The video recording alone may capture incriminating gestures and permit lip-reading. Moreover, the criminal defendants' attorneys' likely have an ethical duty to inform their clients that the cameras have audio recording capabilities and that, despite the City's representations, there can be no guarantee that audio recording has actually been disabled.

Indeed, the mere presence of the cameras will inhibit open communication between attorney and client. Criminal defendants in the custody of the Department of Correction prior to arraignment withstand circumstances that, guilty or not, render them unable to make significant choices. In addition to being locked in holding cells, they have extremely limited capacity to make any choices about whether, when or what to eat, use the restroom, contact loved ones, get medical attention or use their agency reliably in any number of ways. They have spent up to 24 hours being forcibly transferred to various buildings and have been subjected to arrest and interrogation. They are often tired, hungry, confused, distrusting and frustrated before the first meetings with publicly provided defense attorneys even begin. To introduce into that initial conversation a surveillance camera would further poison this already fragile first encounter. This climate of distrust is not likely to be cured by a sign, posted by the City (which has just arrested the defendant) representing that the audio is turned off.

Taking these circumstances together, there can be no serious question that the presence of surveillance cameras in the attorney-client interview booths will cause the criminal defendants in Richmond County "to be inhibited from speaking openly and freely" to their attorneys. This inability of a criminal defendant to freely communicate with his or her attorney prior to the arraignment is precisely the situation that led Judge Chin to find a Sixth Amendment violation, resulting in the Settlement Order. Simply, by installing cameras in the interview rooms, the City has violated the portion of the Settlement Order requiring it to provide "an interview booth for pre-arraignment detainees to consult privately with counsel." (emphasis added). Thus, by this Order to Show Cause, Plaintiffs seek a finding that the City is in violation of the Settlement Order and that, as a remedy for such violation, the surveillance cameras be removed (the "Motion to Enforce"). Moreover, while the Motion to Enforce is pending, Plaintiffs respectfully

request that the Court grant a preliminary injunction ordering the immediate removal of all cameras from the attorney-client interview rooms in the Richmond County Criminal Court, and, while the application for a preliminary injunction is pending, an order temporarily restraining the City from operating such cameras.

## BACKGROUND

This case was commenced in 1992 as a putative class action to address numerous violations of the constitutional rights of detained criminal defendants in New York City awaiting arraignments or appearances. The case was brought on behalf of "persons who are, or will in the future be, detained by defendants in New York City ("NYC") police precincts, central booking facilities, and criminal court buildings while awaiting their arraignments or appearances in other proceedings in connection with potential criminal prosecutions against them." Grubbs v. Safir, 1999 WL 20855, at *1 (S.D.N.Y. 1999). The Court (Chin, J.) granted class certification on January 19, 1996. Id. at *4.

The Plaintiffs moved for summary judgment. Among the claims on which Plaintiffs sought summary judgment was Plaintiffs' claim that "the denial of private attorney-client interview facilities in Richmond County violates plaintiffs' Sixth Amendment right to counsel." Id. On summary judgment, the Court concluded that there was no factual dispute that "[p]rivate attorney-client consultation facilities are not available in the Richmond County Criminal Court." Id. at *6. The Court concluded that Plaintiffs had a constitutional right to counsel at their arraignments, and that this right included a right to confer with counsel immediately prior to arraignments. Id. at *7. On the question of whether the Sixth Amendment required that such conferences be private, the Court reasoned as follows:

> As to this issue of privacy, I do not accept defendants' argument that speaking to one's attorney in the presence of other detainees as well as court officers (who are

also in the vicinity) is sufficient for every detainee. The assistance of counsel would be rendered meaningless if that counsel's client were to be inhibited from speaking openly and freely. The existing condition in Richmond County may well prevent a plaintiff from speaking openly and freely to her/his counsel prior to a court appearance.

Id. at *7. The Court thus concluded that Defendants were required to provide access to private attorney client consultations, but deferred a decision on the remedy until after a trial: "Because there are a number of facts and issues that the Court must consider in fashioning a remedy for this claim, however, I do not here decide what defendants must do to provide access for private attorney-client consultations in Richmond County." Id. at *7.

Before a trial occurred, however, the parties reached a settlement. With respect to Judge Chin's findings concerning the lack of private spaces for attorney-client interviews at the Richmond County Criminal Court, the settlement agreement addressed these findings at paragraph 11: "The City shall use its best efforts to construct or install, by August 31, 1999, an interview booth for pre-arraignment detainees to consult privately with counsel in the courthouse at 67 Targee Street, Staten Island, New York." The settlement agreement was approved and adopted by Judge Chin on September 24, 1991[Dkt. No. 61] as the judgment of the Court (the "Settlement Order"). Shortly after the Settlement Order was entered, on September 24, 1999, the case was closed.

On March 26, 2015, this case was re-opened so the parties could file a partial modification to the Settlement Order. The modification related to medical screening and did not relate in any way with private attorney-client consultation at the Richmond County Criminal Court. Thus, the portion of the Settlement Order relating to such private attorney-client consultation remains in effect and continues to bind the City.

Over the last several years, construction has been underway of a new courthouse at 26 Central Avenue, Staten Island, New York. The new courthouse was to replace (and now has replaced), among other courts, the Richmond County Criminal Court building at 67 Targee Street. During a tour of that facility in December 2014, an attorney for the Legal Aid Society ("Legal Aid") noticed that there were surveillance cameras inside the pre-arraignment interview booths. Affidavit of Christopher Pisciotta in Support of Plaintiffs' Application ("Pisciotta Aff.") at ¶ 5. When attorneys from Legal Aid objected to the cameras, they were initially told that the cameras would monitor counsel and were intended to ensure that counsel could not pass contraband to pre-arraignment detainees. Id. at ¶ 7. During subsequent tours, Legal Aid attorneys have confirmed that the cameras will actually monitor the detainees' side of the interview room, not counsel's. Id. at ¶ 14. Indeed, the cameras are pointed at the location where the detainees sit. See id. Legal Aid attorneys were then told by representatives of the City that the purpose of the cameras is detainee security. Id. at ¶ 13. In response, Legal Aid attorneys pointed out that the cameras inside the holding area, cameras in the passageways, the clear visibility lines for officers, and the other options to place cameras, would address security without violating privacy inside the interview booths. City representatives told legal attorneys that they would respond to these concerns. Id. at ¶ 8.

On June 5, 2015, Legal Aid sent a demand letter to the City informing the city that the placement of the cameras inside the interview rooms would, among other things, violate the Sixth Amendment rights of detainees being arraigned at the Richmond County courthouse. Id. at ¶ 10, Ex. A. On September 22, 2015, on a subsequent tour of the new Richmond County courthouse, an attorney for the City informed Legal Aid attorneys that the cameras would not be

removed absent a court order. The Legal Aid attorneys were also informed that the video recordings would be maintained for 90 days and subject to subpoena practice. Id. at ¶ 15.

On September 29, 2015, Legal Aid sent a second demand letter, reiterating Legal Aid's objections to the use of surveillance cameras in the attorney-client interview rooms and further advising that the cameras also violate the September 24, 1999 so-ordered settlement agreement [Dkt No. 61] in this case. Id. at ¶ 29, Ex. B. The cover email attaching the September 29, 2015 demand letter advised the City that Legal Aid anticipated taking legal action to address the violations as soon as October 1, 2015.

Legal Aid objected to the cameras for the obvious reason that they would intrude on the confidential attorney-client relationship and inhibit fee and open communication between client and attorney prior to the clients' arraignments. An arraignment is a critical stage of a criminal case. It is when bail may be set, urgent early investigation opportunities can be initiated, grand jury rights for felonies are discussed, and the beginning of an attorney-client relationship is developed. Id. at ¶ 4. Thus, the interview with the client immediately prior to the arraignment is critical, and any inhibition of a clients' ability to freely and openly communicate has the potential to severely harm a criminal defendant's case. Moreover, the communications at such interviews are not always verbal. Such defendants routinely gesture, emote, demonstrate or show injuries or tattoos during arraignment interviews in order to communicate with their lawyers concerning their case the circumstances leading to their arrest. Id. at ¶ 3.

Legal Aid's original concerns about the surveillance cameras were confirmed on the first day of opening of the new courthouse at 26 Central Avenue, Staten Island, on September 28, 2015. Indeed, the first criminal defendant interviewed by Legal Aid in the new courthouse prior to his arraignment, upon being informed of the cameras, felt that he could not communicate

openly with his attorney. Id. at ¶ 25; Affidavit of F.V. in Support of Plaintiffs' Application ("F.V. Aff.") at ¶ 5, 6, 7. Indeed, there were several times when such defendant used his hands to describe something until his attorney reminded me that he was being recorded. Pisciotta Aff. at ¶ 26; F.V. Aff. at ¶ 6. The cameras made him feel uncomfortable and as if he could not fully explain what he needed to explain about his case. F.V. Aff. at ¶ 6.

As of the date of this filing, the cameras remain in place and continue to monitor and record pre-arraignment interviews between attorneys and detainees at the Richmond County Criminal Court.

## ARGUMENT

### I. THE COURT SHOULD GRANT PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER

A party is entitled a preliminary injunction if it can "show irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." American Civil Liberties Union v. Clapper, 785 F.3d 787, 825 (2d Cir. 2015). The Court may also consider whether balance of equities tips in Plaintiffs' favor and whether a preliminary injunction would be in the public interest. Winter v. NRDC, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).[1] As set forth below, Plaintiffs have made all required showings necessary for a preliminary injunction.

### A. Plaintiffs Are Likely To Succeed on The Merits, as the City Has Clearly Violated the Settlement Order

---

[1] In Clapper, the Second Circuit made clear that the standard for obtaining a preliminary injunction set forth in Winter v. NRDC, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), which includes "balancing of the equities" and "public interest" prongs, is in the alternative to the standard set forth in Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 215 (2d Cir.2012), under which showings of a likelihood of success and irreparable harm are sufficient to obtain a preliminary injunction. See Clapper, 785 F.3d at 825.

To establish a likelihood of success on the merits "[t]he movant need not show that success is certain, only that the probability of prevailing is "better than fifty percent." BigStar Entm't, Inc. v. Next Big Star, Inc., 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000) (quoting Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir.1985)). Here Plaintiffs can easily show that they are more likely than not to prevail on their Motion to Enforce.

As an initial matter, this Court clearly has authority to enforce the Settlement Order entered in this case and to remedy the City's violation thereof. See Ottley v. City of N.Y., No. 08 Civ. 2994, 2012 WL 4857544, at *1 (S.D.N.Y. 2012) ("Not only does the Court have the power to enforce the settlement agreement entered by the parties and formally approved through court order, it has a duty to do so."); see Kohn Indus. Park Co. v. Rockland Cnty., 710 F.2d 895, 900 (2d Cir. 1983) ("[T]he district court has the power to enforce the settlement agreement entered into by the parties and formally approved through the court order.").

The Settlement Order, attached to this memorandum as Exhibit A,[2] requires that the City provide "an interview booth for pre-arraignment detainees to consult privately with counsel...." Thus, the simple question on the Motion to Enforce is whether the attorney-client interview rooms in the Richmond County Criminal Court, which currently have the City's surveillance cameras pointed at criminal defendants and set to record, allow clients to "consult privately" with their attorneys prior to their arraignment. The question answers itself. By definition, surveillance cameras are incompatible with privacy. The cameras permit the City to monitor every movement and gesture by every criminal defendant who meets with his or her attorney prior to arraignment. The cameras will also permit lip-reading. Moreover, because the cameras are set to record, and because the recordings will be kept for a minimum of 90 days, the City will

---

[2] The Settlement Order consists of the settlement agreement between the parties, as well as the docket entry [Dkt. No. 61] approving and adopting the settlement agreement as the judgment of the Court.

have the ability to review the footage as they see fit, and potentially to use such footage against the criminal defendants in their criminal proceedings. Thus, under no stretch of the imagination do the attorney-client interview rooms permit clients to "consult privately" with their attorneys.

Moreover, any doubt about whether the cameras violate the "private consultation" requirement of the Settlement Order is eliminated by consideration of Judge Chin's opinion in this case, which gave rise to the Settlement Order. Judge Chin found that criminal defendants had a Sixth Amendment right to the assistance of counsel immediately prior to their arraignment. Grubbs v. Safir, 1999 WL 20855, at *7 (S.D.N.Y. 1999). He further found that "[t]he assistance of counsel would be rendered meaningless if that counsel's client were to be inhibited from speaking openly and freely." Id. Before Judge Chin decided on the exact remedy for the constitutional violation, the parties reached a settlement, which became the Settlement Order. Thus, the "private consultation" requirement, agreed upon by the parties and so-ordered by the Court, was designed to remedy a violation of the Sixth Amendment, which, as Judge Chin found, requires the ability of a criminal defendant to speak "openly and freely" with his or her attorney.

There is no question that the surveillance cameras will inhibit open and free communication between attorney and client. As set forth above, the cameras will capture and record every movement by the criminal defendants, and will permit lip-reading. Those circumstances alone will prevent clients from communicating freely. Moreover, notwithstanding the representation from the City that the audio function of the camera is turned off, the mere presence of the camera will prevent a client from speaking openly and freely. A client who has just been arrested is unlikely to trust the representation of the City that the audio is turned off. Moreover, any such suspicion by a criminal defendant would not be unfounded, in light of

numerous well-documented examples of surreptitious recording of attorney-client conversations by law enforcement agencies.[3]

As Judge Chin found, the inability of criminal defendants to communicate "openly and freely" with their attorneys violated their Sixth Amendment right to counsel. Indeed, the Sixth Amendment's guarantee of right to counsel requires "[f]ree two-way communication between client and attorney." United States v. Levy, 577 F.2d 200, 209 (3d Cir. 1978) (requiring dismissal of indictment when attorney-client privilege has been breached); see also Grubbs, 1999 WL 20855 at *7. Even the fear of the loss of privacy can inhibit attorney-client communication to the point of a loss of the right to counsel. See Weatherford v. Bursey, 429 U.S. 545, 554, n. 4 (1977) (recognizing that "[o]ne threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard.").

---

[3] For example, recently, the Police Chief in Edison, New Jersey recorded attorney-client conversations through surveillance cameras for 11 months despite promises that the microphones were disabled. Mueller, Mark. "Listening devices in Edison Police Headquarters Secretly Recorded Offices, Attorneys, Civils", New Jersey Advance, December 15, 2013, available at
http://www.nj.com/news/index.ssf/2013/12/listening_devices_in_edison_police_headquarters_secretly_re corded_discussions_of_officers_attorneys.html listening devices in Edison police headquarters secretly recorded discussions of officers attorneys.html. A Police Sheriff in Louisiana secretly recorded conversations in the precinct between attorneys and their clients until his actions were revealed by a whistleblower. Linderman, Juliet, "Secret Recordings at St. John's Sheriffs Office not illegal, State Police concluded," Times-Picayune, available at
http://www.nola.com/crime/index.ssf/2013/08/allegations_that_st_john_sheri.html. Florida police unlawfully recorded conversations between an attorney and their client in an interview room in the precinct via a closed-circuit camera. McCue, Dan. "Egregious Eavesdropping Wins Police No Favors", CourtHouse News Service, April 10, 2014, available at
http://www.courthousenews.com/2014/04/10/66978.htm. And as documented in 2003 in a report by the Office of the Inspector General, (010) of the United States Department of Justice, staff members at the Metropolitan Detention Center (MDC) in Brooklyn not only videotaped detainees' visits with their attorneys, but secretly and unlawfully audiotaped them as well. The OIG found: "On many videotapes, we were able to hear significant portions of what the detainees were telling their attorneys and sometimes what the attorneys were saying as well." U.S. Department of Justice, Office of the Inspector General, Supplemental Report on September 11 Detainees' Allegations of Abuse at the Metropolitan Detention Center in Brooklyn, New York, at 31 (Dec. 2003).

Federal courts have recognized "the need for sufficient interview facilities, both as to quantity and privacy." Dreher v. Sielaff, 636 F.2d 1141, 1145 (7th Cir. 1980). "Forcing prisoners to conduct their meetings with their attorneys in the open or to yell over the phone obviously compromises the consultation... The right to an attorney would mean little if it did not effectively attach until the hushed whispers at the defense table the morning of trial...". Johnson-El v. Schoemehl, 878 F.2d 1043, 1052 (8th Cir. 1989). In Johnson-El, the Eighth Circuit ruled that requiring prisoners awaiting trial "to meet with their attorneys in public areas of the jail where their conversations could be overheard by guards and other prisoners" violated their right to counsel. Id. at 1053. Similarly, other courts have found non-confidential interview facilities to be a constitutional violation. See, e.g., Ching v. Lewis, 895 F.2d 608, 609 (9th Cir. 1990) (requiring prisoner to "yell through a hole in the glass" to his attorney abridged his right "to communicate privately with an attorney"); State v. Gibbs, 2012 WL 6845687 (Del. Super. Ct. 2012) (ordering relief for denial of a private attorney-client interview setting by transferring inmate to facilitate private communication); United States v. Elzahabi, No. CRIM.04-282(JRT), 2007 WL 1378415, at *2 (D. Minn. May 7, 2007) ("further [video] monitoring of defendant's communications with counsel, whether inadvertent or deliberate, whether seen or unseen, will be deemed a knowing intrusion on the attorney-client relationship in violation of defendant's Sixth Amendment right to counsel.").

As the cases demonstrate, the Sixth Amendment requires that criminal defendants be able to speak to their attorneys in private. The lack of facilities at the Richmond County Criminal Court for such private consultations was precisely the Sixth Amendment violation that the Settlement Order was designed to remedy. Now, after 17 years of complying with the Settlement Order, the City has undone that remedy, and reinstated the Sixth Amendment

violation, by installing security cameras in the interview rooms. As the Court in Elzahabi recognized, deliberate, or even inadvertent, video monitoring of attorney client meetings, could violate the Sixth Amendment's right to counsel. 2007 WL 1378415, at *2. Here the Defendant has deliberately installed cameras in the dedicated attorney-client interview rooms, despite the Settlement Order, the stated concerns of Plaintiffs' counsel in their criminal proceedings, and Judge Chin's determination, in this very case, that of lack of private attorney-client interview spaces in Richmond County violated the United States Constitution. These facts easily establish a likelihood of success in showing that the City is in violation the Settlement Order.

**B.    Plaintiffs Will Be Irreparably Harmed by The Continued Violation of the Settlement Order and their Sixth Amendment Right to Counsel**

Absent the grant of an immediate temporary restraining order, Plaintiffs will suffer irreparable harm by the continued presence of the cameras in the attorney-client interview rooms. Irreparable harm is an injury that is neither remote nor speculative, but actual and imminent and cannot be remedied by an award of monetary damages. Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995). It is well settled in the Second Circuit that a violation of a constitutional right causes irreparable harm per se, and most courts do not require a further showing of irreparable injury. Mitchell v. Cuomo, 748 F.2d 804, 806 (2nd Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (quoting 11C. Right & Miller, Federal Practice and Procedure, § 2948, at 440 (1973); Santa Fe Natural Tobacco Co., Inc. v. Spitzer, No. 00 CIV 7274 LAP, 2000 WL 1694307, at *1 (S.D.N.Y. 2000) ("in general, deprivation of a constitutional right constitutes irreparable injury.") "[W]here. . . the constitutional deprivation is convincingly shown and that violation carries noncompensable damages, a finding of irreparable harm is warranted." Donohue v. Mangano, 886 F.Supp. 2d 126, 150 (E.D.N.Y.

2012).

Here, because the City's placement of cameras in the attorney-client interview rooms violates Plaintiff's Sixth Amendment right to counsel, as well as the Settlement Order designed to remedy that violation, Plaintiffs need not make a further showing of irreparable injury. See McClendon v. City of Albuquerque, 272 F.Supp. 2d 1250, 1259 (D. N.M. 2003) (holding that Defendants' limitations on counsel's access to detention facility constituted a violation of the class and sub-class member's constitutional right to access to courts, and plaintiffs did not need to make further showing of irreparable harm).

Moreover, even if Plaintiffs did need to make a further showing (and they do not), the facts of this case demonstrate that Plaintiffs will suffer actual and immediate harm that cannot be remedied by the award of monetary damages. Plaintiffs' attempts to communicate openly with counsel during pre-arraignment interviews were, are, and will continue to be frustrated by the surveillance cameras in the pre-arraignment interview room. Upon Plaintiffs' initial meeting with counsel, Plaintiffs are informed of the surveillance cameras, advised that these cameras are recording, and further advised that the video recording may be used against them in the criminal proceedings and the attorney cannot verify the City's representation that the audio capabilities are turned off. This naturally deters Plaintiffs from openly sharing with counsel important information and facts, or otherwise providing their attorneys with critical information necessary for counsel to provide effective assistance at the arraignment. This causes irreparable injury to Plaintiffs, as they are unable to adequately prepare for arraignments, which has far reaching consequences. See Johnson v. Sullivan, No. 1:06-cv-01089, 2008 WL 5396614, at *6 – 7 (E.D. Cal. 2008) (injunctive relief was warranted where Plaintiff was not allowed to confer with counsel and argued he was irreparably harmed as he was unable to prepare his case for trial and

was effectively denied access to the courts).

A criminal defendant only has one shot at an arraignment. Inadequate representation at the arraignment may irreparably harm a criminal defendant in a number of ways. For example, counsel's inability to collect information concerning the nature of the alleged crime, or the defendant's ties to the community, will impede counsel's ability to argue effectively that bail should not be set, or that it should be set low. As a result, criminal defendants may spend weeks or months in jail unnecessarily, because they were prevented from providing critical information to their attorneys that would have been relevant to the bail argument. Similarly, inadequate representation at arraignments may prevent early disposition of some cases, leading to drawn out and unnecessary criminal proceedings against Plaintiffs.

For the reasons set forth above, Plaintiffs will be irreparably harmed by the presence of surveillance cameras in the attorney-client interview rooms at the Staten Island Criminal Court.

C.    **The Balancing of the Equities Weighs in Favor of the Plaintiffs and a Temporary Restraining Order and Preliminary Injunction Would Not Disserve the Public Interest**

The balancing of the equities/hardships also weighs in favor of the Plaintiffs. See R Squared Global, Inc. v. Serendipity 3, Inc., No. 11 Civ. 7155 (PKC), 2011 WL 5244691, at *5 (S.D.N.Y. 2011) ("A court may issue a preliminary injunction only if the movant has demonstrated. . . sufficiently serious question going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor.") (internal quotations omitted). Here, the hardship to Plaintiffs if a temporary restraining order and/or preliminary injunction is not granted is obvious. As set forth above in Sections I.A and I.B, Plaintiffs' constitutional right to counsel will continue to be infringed by the continued presence and use of surveillance cameras in attorney-client interview rooms, with no adequate post hoc

remedy for such infringement. On the other hand, if the court grants a temporary restraining order and/or a preliminary injunction ordering the immediate removal of the surveillance cameras, the City will experience no real hardship. In fact, prior to the construction of the new courthouse in Richmond County, and as recently September 25, there were no cameras recording attorney-client interactions at the Richmond County Criminal Court. Moreover, the City does not use cameras in attorney-client interview rooms in any other borough. Thus, there is no basis for the City to argue that such cameras are necessary. Thus, any hardship the City may articulate cannot outweigh the demonstrated hardship that Plaintiffs will face if the cameras remain in use.

Moreover, a preliminary injunction is clearly in the public interest. "The public has a clear interest in protecting the constitutional rights of all its members." Ligon v. City of New York, 925 F.Supp. 2d 478, 541 (S.D.N.Y. 2013). As set forth above, the surveillance cameras in attorney-client interview booths not only violate the Settlement Order, they also violate criminal defendants' Sixth Amendment rights. Indeed, the Settlement Order was intended to remedy the City's violation of the Sixth Amendment found by Judge Chin. Thus, the public's interest in the preservation of constitutional rights, as well as the City's compliance with court orders, will be served by the immediate removal of the surveillance cameras.

## II. THE COURT SHOULD GRANT THE MOTION TO ENFORCE THE SETTLEMENT ORDER

As set forth above in Section I.A, the City has violated the Settlement Order by installing surveillance cameras in the attorney-client interview rooms at the Richmond County Criminal Courts. Therefore, this Court should find the City in violation of the Settlement Order and, as a remedy for such violation, order the permanent removal of such cameras.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court grant an order (1) finding the City of New York and the New York City Department of Corrections in violation of the September 24, 1999 Order Approving Settlement in this action and ordering, as a remedy, the permanent removal of all surveillance cameras from the attorney-client interview rooms the Richmond County Criminal Court; and (2) granting a preliminary injunction, pursuant to Fed. R. Civ. P. 65(a), ordering the City of New York and the New York City Department of Corrections to immediately remove such surveillance cameras while the proceedings to enforce the September 24, 1999 Order Approving Settlement are pending; (3) granting an order, pursuant to Fed. R. Civ. P. 65(b), temporarily restraining the Defendants from operating such cameras while Plaintiffs' application for a preliminary injunction is pending, and (4) granting such other relief as the Court deems just and proper.

Dated: October 1, 2015
New York, New York

Respectfully submitted,

/s/ *William Gibney*

William Gibney
Cynthia Conti-Cook
THE LEGAL AID SOCIETY
Criminal Defense Practice
Special Litigation Unit
199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3419

Gregory G. Little
Colin T. West
Joshua Elmore
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200

*Attorneys for Plaintiffs*

Americas 90816675 (2K)

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

CORALYN GRUBBS, LEWIS SMITH, ALI
RIVERA, and SEAN MILLER, individually and on
behalf of all other persons similarly situated,

                                Plaintiffs,

              - against -

HOWARD SAFIR, in his official capacity as Police
Commissioner of the City of New York; NEW
YORK CITY POLICE DEPARTMENT;
BERNARD KERIK, in his official capacity as
Commissioner of Correction of the City of New
York; NEW YORK CITY DEPARTMENT OF
CORRECTION; RUDOLPH GIULIANI, in his
official capacity as Mayor of the City of New
York; and THE CITY OF NEW YORK,

                                Defendants.

-------------------------------------------------------------------x

**STIPULATION OF
SETTLEMENT**

92 Civ. 2132 (DC)

        Plaintiffs commenced this action on March 25, 1992, seeking declaratory and

equitable relief to change the conditions of confinement to which they were subjected from the

time of their arrest until their arraignment, and in some instances, when produced from jail to

court for post-arraignment court proceedings in their criminal cases. The complaint alleged that

those Plaintiffs who were pre-arraignment detainees were held for as long as three days under

unhealthy and unsafe conditions; denied consistent access to necessary food, drink and related

services; forced to sit and sleep in dirty cells with inadequate ventilation; held by Defendants

under conditions that spread communicable diseases; denied adequate medical care and screening;

denied an opportunity to wash; and denied an opportunity to call family, a friend or a lawyer.

The complaint further alleged that those pre-arraignment detainees who were arrested in Queens and Richmond Counties were denied an opportunity to privately consult with counsel and that female pre-arraignment detainees were held in particularly harsh conditions. It also alleged that those Plaintiffs who were committed to jail following arraignment and subsequently produced from jail for court appearances were held in unsafe and dirty cells with inadequate ventilation.

All Defendants answered the complaint and denied the material allegations set forth therein. An Answer was filed on May 28, 1992, by Defendants Matthew T. Crosson, sued in his official capacity as Chief Administrator of the Courts, Milton L. Williams, sued in his official capacity as Deputy Chief Administrative Judge of the New York City Courts, and The Office of Court Administration of the New York State Courts ("the former Court Defendants"). An Answer was filed on June 3, 1992, by Defendants Lee Brown, sued in his official capacity as Police Commissioner of the City of New York, The New York City Police Department ("NYPD"), Gerald Mitchell, sued in his official capacity as Acting Commissioner of Correction, the New York City Department of Correction ("DOC"), David Dinkins, sued in his official capacity as Mayor of the City of New York and the City of New York (the "City Defendants"). On October 15, 1992, the Court (Leisure, J.) entered a protective order to protect the confidentiality of all plans pertaining to holding and/or detention areas in any NYPD, DOC or NYC courthouse facility, including but not limited to floor plans, mechanical drawings, ventilation plans, structural plans, plumbing and electrical plans which have been sought by and disclosed to Plaintiffs in discovery. The parties then agreed before Judge Leisure to postpone motion practice to permit the discussion and investigation of the conditions at issue. Such meetings and investigation were held, and on September 19, 1995, a Stipulation and Order was

entered for settlement as to the Court Defendants. A mutually agreeable resolution of Plaintiffs' claims with regard to the City Defendants could not be reached.

On November 8, 1995, Plaintiffs filed a motion for class certification, pursuant to Federal Rule of Civil Procedure 23(a)(b)(1) and (2). On January 23, 1996, the Court (Chin, J.) certified a class of all persons who are held by the City Defendants in police precincts, central booking facilities and criminal court buildings in New York City while awaiting their arraignment, or who were held by the City Defendants following arraignment in criminal court buildings while appearing for other proceedings in connection with their criminal prosecutions.

The parties then conducted discovery. On September 25, 1997, the Plaintiffs moved for partial summary judgment, and on November 19, 1997, the City Defendants filed their opposition to that motion. On January 15, 1999, the Court denied Plaintiffs' motion for partial summary judgment, ruling that there were issues of fact to be resolved at trial. The Court set a trial date of June 21, 1999. The parties then renewed their efforts to settle the case.

The parties agree that since 1992, the City Defendants have reduced the arrest to arraignment time of Plaintiffs to an average of less than twenty-four (24) hours.

The parties agree that since 1992, the City Defendants have made or begun significant capital improvements in three of the central booking facilities in which those Plaintiffs who are pre-arraignment detainees are held. Between 1992 and 1993, the first floor pre-arraignment detention area for females in the Manhattan courthouse was expanded and remodeled. In 1996, the City Defendants opened a new central booking facility for Queens County ("Queens pre-arraignment court section"), and also a new central booking detention area for men in New York County ("Manhattan pre-arraignment court section"). In 1999, the City Defendants began

a renovation of the central booking facilities for women in Richmond County, which is scheduled for completion in September 1999.

The parties further agree that the City Defendants have made significant improvements to the ventilation systems in several of the central booking facilities in which those Plaintiffs who are pre-arraignment detainees are detained. In the Brooklyn pre-arraignment court section, between 1996-1999, a central air purifying unit ("crab unit") and a new central air conditioning unit with a fresh air hook-up was installed in the intake area; and two stand alone air purifying units ("NQ500") were installed - one in intake and one in the staging area. In the Manhattan pre-arraignment court section, between 1992 and 1993, the female area windows were modified, smoke ejecters and fans were installed, and the wall separating the female area was replaced with perforated sheet metal to allow for greater air circulation. In July 1996, a new independent air exchange system in the men's area was installed. In the Bronx pre-arraignment court section, in 1996, NQ500 units were installed on the second and third floors, and in 1998, a crab unit was installed on first floor. In 1997, at the 120th Precinct in Staten Island, an NQ500 unit was installed in the arrest processing area and an NQPILLAR/HEPA/UV carbon air treatment unit was installed in the male overnight lodging area. When the current renovations at the 120th Precinct are completed, NQ500 units will be installed in both the women's and men's overnight areas. In addition, HEPA filters have been installed in areas where Emergency Medical Services ("EMS") performs the medical screenings. The parties further agree that the City Defendants have instituted a plan for regular cleaning and maintenance of the ventilation systems in the central booking facilities and courthouse detention areas where Plaintiffs are held.

The parties further agree that the City Defendants have instituted a cleaning and maintenance schedule in the pre-arraignment court sections to insure that they are thoroughly

cleaned each day and given a comprehensive cleaning every three months; that the City Defendants have retained the services of qualified professional exterminators to control vermin and insects within the pre-arraignment court sections; and that the City Defendants have implemented procedures for the repair of plumbing and general maintenance for the central booking facilities.

The parties further agree that the City Defendants have made significant improvements to the fire safety systems in the central booking facilities and courthouse detention areas. They have established fire safety procedures, have repaired or where necessary replaced fire safety equipment, have designated and trained fire safety officers, established fire evacuation plans, and have implemented a plan for inspection and maintenance of fire safety equipment.

The parties further agree that the City Defendants have arranged for food service for all of the central booking facilities, including, in the pre-arraignment court sections, sandwiches using Halal products for Muslim pre-arraignment detainees and non-meat sandwiches for pre-arraignment detainees who do not eat meat, have installed refrigerators in all pre-arraignment court sections to store food and drink items for Plaintiffs who are processed for arrest between the established feeding times, have provided all pre-arraignment detainees with access to potable drinking water and sanitary supplies, and have installed telephones in all central booking facilities.

The parties further agree that the City Defendants have made significant efforts to provide medical screening to those Plaintiffs who are pre-arraignment detainees. They have opened Medical Screening Units in the pre-arraignment court sections in New York, Kings, Bronx, and Queens Counties, and have retained the services of emergency medical technicians ("EMTs") from the New York City Fire Department to operate these units. They have also

adopted plans to secure medical screening for those pre-arraignment detainees who are not held

in the pre-arraignment court sections because of their designation as "Special Category" prisoners.

The parties agree that the Court has jurisdiction over this action and the parties.

and that the Court has the authority to order the relief set forth in this Stipulation. The parties

stipulate, based on the entire record, that the remedies set forth in this Stipulation are narrowly

drawn, extend no further than necessary to correct violations of federal rights of the Plaintiff

class, and are the least intrusive means necessary to accomplish redress.

**IT IS HEREBY STIPULATED AND AGREED** by the parties that Plaintiffs'

claims shall be resolved without further litigation by the entry of a Final Judgment incorporating

the terms of this Stipulation, following its approval by the Court after notice of its terms is

provided to the class. The parties stipulate as follows:

1. Plaintiffs claims in paragraphs "44" through "47" of their complaint,

regarding police vans, are withdrawn without prejudice.


**DEFINITIONS:**

2. The parties agree that the following words and phrases as used below in

this Stipulation shall have the following meaning:

(a) "Pre-arraignment detainee" shall mean an individual who has been
taken into police custody and brought to a pre-arraignment
detention facility, whether it be a precinct, or a pre-arraignment
court section.

(b) "Contact information" shall mean name, address and telephone
number.

(c) "Defendants", as used below, shall mean only the City Defendants.

(d) "Precinct/unit level training" shall mean training at the precinct level by precinct training personnel using materials produced by the NYPD Police Academy.

(e) "Pre-arraignment court section" shall mean a borough court section in Manhattan, Bronx, Brooklyn and Queens designed to lodge and process pre-arraignment detainees prior to arraignment.

## MEDICAL CARE OF PRE-ARRAIGNMENT DETAINEES:

3. Any pre-arraignment detainee who asks to be seen by a physician shall be transported to a hospital as soon as practicable, in accordance with the severity of the pre-arraignment detainee's medical condition.

4. If, at the time of arrest, a pre-arraignment detainee is taken into custody and has with him or her a pharmacy labeled container that lists the names of the prescription medication and pharmacy, the container with its contents shall be vouchered in accordance with NYPD procedures and a Medical Treatment of Prisoner form shall be completed. The following notations shall be made on the Medical Treatment of Prisoner form:

(a) a check indicating "yes" shall be made in the part of the form asking whether prescription medication was possessed at arrest;

(b) the property voucher number for the contents of the container shall be recorded in the appropriate box; and

(c) in addition, the following information shall be recorded: the contact information for the pharmacy, the prescription number, and when a physician's name appears on the container, the contact information for the physician.

Should a hospital physician treating a pre-arraignment detainee indicate that he needs information about the vouchered contents of the pharmacy container, the physician shall be given the voucher number and be advised on how to contact the desk officer in the NYPD facility where the

vouchered pharmacy container is being held. Desk officers receiving such telephone requests from hospital physicians or the health care personnel assisting the physicians shall be authorized to provide the name of the medication. Should the hospital physician, after learning the name of the medication, advise the desk officer that the medication is not available at the hospital and request that the medication be delivered to the hospital, the desk officer shall arrange for the vouchered pharmacy container to be delivered.

5. If a physician at a hospital provides a pre-arraignment detainee with medication to be taken by the pre-arraignment detainee during the pre-arraignment period, the police officer accompanying the pre-arraignment detainee shall take custody of the medication until the officer reaches the pre-arraignment court section, at which time the medication shall be given to the EMT to hold until the pre-arraignment detainee needs to self-administer the medication. Notwithstanding the above, no EMT shall be allowed to perform any service that is not permitted by the EMTs' scope of practice, as defined by the New York State Department of Health. For example, EMTs shall not hold injectibles, or controlled substances. If a pre-arraignment detainee needs further medication during the period of pre-arraignment detention in any form that is not authorized by the EMTs' scope of practice, he or she will be taken to a hospital for that medication.

6. If an individual identifying him or herself as a relative or a member of the pre-arraignment detainee's household appears at the precinct where the pre-arraignment detainee is located and indicates that the pre-arraignment detainee has a medical condition or needs medication, a "Medical Treatment of Prisoner Form" shall be completed. The "Medical Treatment of Prisoner Form" shall indicate that a self-identified relative or household member presented at the precinct with medical or medication information and shall indicate the contact

information for that relative or household member. Should a self-identifying relative or household member bring to the precinct a pharmacy labeled container that lists the names of the prescription medication and the pharmacy, and lists the name of the pre-arraignment detainee, the contact information for the pharmacy, the prescription number, and where the physician's name appears on the container, the contact information for the physician shall also be recorded on the "Medical Treatment of Prisoner Form." Notwithstanding the above, no police officer will be required to accept medication or pharmacy labeled containers and their contents from relatives or household members for the purpose of providing medication to the pre-arraignment detainee or vouchering the medication.

7. Within 90 days of approval of this Stipulation by the Court, the NYPD will issue an interim order that incorporates the principles in paragraphs "3" through "6." Within 90 days of issuing the order, NYPD shall commence precinct/unit level training or its equivalent to superiors and officers affected by this new order.

## PHYSICAL PLANT ISSUES:

8. The City shall use its best efforts to expand capacity for holding pre-arraignment detainees at the Pre-Arraignment Court Section at 120 Schermerhorn Street, Brooklyn, New York, ("Schermerhorn St. facility"), by making the following renovations by the dates indicated:

(a) By November 1, 1999, the larger women's holding cell in the staging area shall be expanded to increase cell space and a stainless steel toilet/sink/fountain fixture ("new toilet fixture") shall be added to this cell;

(b) By November 1, 1999, the smaller women's holding cell in the staging area shall be renovated by replacing the current toilet with a new toilet fixture;

(c)     By November 1, 2000, the largest male cell in the staging area shall be renovated by adding a new toilet fixture;

(d)     By November 1, 2000, a large new holding cell with a new toilet fixture shall be constructed in the staging area; and

(e)     By November 1, 2000, the rear two cells in the Arraignment Part 2 ("AR2") feeder cell area shall be renovated to include, among other things, new toilet fixtures.

9.     The City shall promulgate procedures to facilitate the timely repair of cells in the Schermerhorn St. facility. In addition, NYPD shall promulgate guidelines regarding distribution of pre-arraignment detainees who are held overnight at the Schermerhorn St. facility so that such pre-arraignment detainees shall be distributed reasonably among the available cells.

10.     The City shall use its best efforts to implement the following ventilation modifications by the dates listed below:

(a)     By September 1, 1999, a new ventilation unit for the staging area in Schermerhorn St. facility shall be installed;

(b)     By September 1, 1999, the ventilation in the area known as the "Men's Specials" detention area in the pre-arraignment court section at 100 Centre St. in Manhattan shall be renovated; and

(c)     By September 1, 1999, the ventilation in the area known as the "Women's area" in the pre-arraignment court section at 100 Centre St. in Manhattan shall be renovated.

11.     The City shall use its best efforts to construct or install, by August 31, 1999, an interview booth for pre-arraignment detainees to consult privately with counsel in the courthouse at 67 Targee Street, Staten Island, New York.

## MONITORING:

12. The monitoring period shall be limited to two years following the approval of this Stipulation.

13. Defendants shall provide Plaintiffs' counsel with a contact person in the Mayor's Office of the Criminal Justice Coordinator who shall accept and respond to inquiries from Plaintiffs' counsel regarding compliance during the monitoring period.

14. Defendants shall provide prompt notice to Plaintiffs' counsel of any delay in the implementation of their obligations under paragraphs "7", "8" and "10" above.

15. To the extent that Defendants modify any of the forms or documents described herein, Defendants shall provide Plaintiffs' counsel with equivalent information to enable Plaintiffs' counsel to monitor.

### A. MEDICAL MONITORING:

16. Documents with confidential medical information shall only be produced in accordance with a confidentiality order issued by this Court.

17. Plaintiffs' counsel shall be provided with the amended version of NYPD's "Medical Treatment of Prisoner" form, and copies of NYPD interim orders or directives and the precinct/unit level training materials reflecting the principles set forth in paragraphs "3" through "6" above, and the schedule for new training on those principles.

18. The Defendants shall provide Plaintiffs' counsel with any "Report of Inmate Death to State Commission of Correction" and supporting documents submitted by either the DOC or the NYPD, concerning the death of a pre-arraignment detainee which occurred during the monitoring period.

19.     Plaintiffs' counsel will periodically review the handling of pre-arraignment detainees with medication and medical care issues by reviewing the EMT medication logs for a designated week, and all NYPD "Medical Treatment of Prisoner" forms completed by NYPD officers during the designated week, along with the corresponding EMT medical screening forms and computer generated NYPD "On-line Booking Arrest Processing Worksheets." These documents shall be provided to Plaintiffs' counsel on a quarterly basis during the last three quarters of the first year following the effective date of this Stipulation and at six month intervals during the second year following the effective date of this Stipulation. The parties agree to establish a schedule for these reviews at least two weeks before the week designated for the collection of documents.

20.     Upon a specific request by Plaintiffs' counsel, the types of documents listed in paragraph "19" shall be provided to Plaintiffs' counsel for any individual pre-arraignment detainee who is the subject of an inquiry made to the Mayor's Office of the Criminal Justice Coordinator under paragraph "13" above.

B.     PHYSICAL PLANT MONITORING:

21.     Subject to the terms of the protective order entered in this action on October 14, 1992, Defendants shall provide Plaintiffs' counsel with a schedule, description and diagrams for the physical plant renovations referred to in paragraphs "8" and "10" above.

22.     The Defendants agree to:

(a)     notify Plaintiffs' counsel of the completion of the cell renovations referred to in paragraph "8" above and the modifications to the ventilation systems described in paragraph "10" above;

(b)     provide Plaintiffs' counsel with the results of a test of the modifications to the ventilation systems referred to in paragraph "10" above;

(c)     provide Plaintiffs' counsel and their expert with access to these areas after the scheduled work is completed, for the purpose of assessing compliance with the Stipulation;

(d)     permit inspection of the pre-arraignment court sections by Plaintiffs' counsel twice each year during the monitoring period;

(e)     following the completion of the physical plant renovations at the Schermerhorn St. facility referred to in ¶ 8, and upon request of Plaintiffs' counsel to Defendants' counsel and the Mayor's Office of the Criminal Justice Coordinator, permit overnight inspection on three separate occasions;

(f)     upon request of Plaintiffs' counsel to Defendants' counsel and the Mayor's Office of the Criminal Justice Coordinator, provide documents regarding physical plant renovations relevant to a question of failure to comply with ¶ ¶ 8, 10 and 11. Disputes regarding the propriety of such document requests may be referred to the Court for resolution and shall be handled in the same manner as a disagreement over pretrial discovery.

## CONCILIATION OF DISPUTES UNDER THIS STIPULATION:

23.     In the event that a dispute arises as to whether Defendants are in compliance with the terms of this Stipulation, counsel for the parties shall make a good faith effort to resolve the dispute. Prior to institution of any proceeding before the Court to enforce the terms of this Stipulation, Plaintiffs' counsel shall notify Defendants' counsel and the contact in the Mayor's Office of the Criminal Justice Coordinator in writing of any claim by Plaintiffs that Defendants are not in compliance with identified provisions of this Stipulation and Plaintiffs' counsel shall request in that writing that these conciliation procedures be used. Unless otherwise resolved, the parties' counsel (and such representatives of the City as shall be appropriate) shall meet within ten business days of the receipt of said notice, in an attempt to arrive at an amicable resolution of the claim. If after fifteen business days following the meeting the matter has not been resolved to the Plaintiffs' satisfaction, Defendants shall be so informed in writing by

Plaintiffs' counsel, and Plaintiffs may then apply to the Court for enforcement of the provisions of the Stipulation identified in the above-described notice.

## CONTINUING JURISDICTION:

24.     The Court shall retain jurisdiction over this action for the purpose of enforcing the provisions of this Stipulation.  In the event of any motion for systemic relief based upon Defendants' alleged non-compliance with the substantive requirements of this Stipulation, Defendants shall be considered to be in "compliance" therewith unless Plaintiffs establish that Defendants' failures or omissions to meet the terms of this Stipulation were not minimal or isolated, but were substantial and sufficiently frequent or widespread as to be systemic.

## TERMINATION OF PROSPECTIVE RELIEF:

25.     The provisions of this Stipulation shall terminate, upon motion of any party or intervenor, two years after this Stipulation is approved by the Court, unless the Court makes written findings, based on the record, that prospective relief: (a) remains necessary to correct a current and ongoing violation of the Plaintiff class' constitutional rights; (b) extends no further than necessary to correct such violation; and (c) is narrowly drawn and the least intrusive means to correct such a violation.

## EFFECTIVE DATES:

26.    Unless otherwise stated, the terms of this Stipulation shall take effect or apply upon entry of an order of the Court approving the terms of this Stipulation.

Dated:    New York, New York
          June  17, 1999

THE LEGAL AID SOCIETY
Criminal Defense Division
Special Litigation Unit
Attorney for the Plaintiffs
90 Church Street, 15th Floor
New York, NY  10007
(212) 577-3554

By:

_____
Susan L. Hendricks (SH1114)
William Gibney (WG1635)

Lankler Siffert & Wohl, LLP
Attorneys For the Plaintiffs
500 Fifth Avenue, 33rd Floor
New York, NY  10110
(212) 921-8399

By:

_____
Roderick C. Lankler (RCL9311)
Lisa A. Baroni  (LB6110)

MICHAEL D. HESS
Corporation Counsel of the
City of New York
Attorney for the City Defendants
100 Church Street, Room 2-111
New York, New York 10007
(212) 788-0960

By:

_____
Julie E. O'Neill  (JO2395)
Alessandra F. Zorgniotti (AZ6233)
Assistant Corporation Counsel

SO ORDERED:

_____
U.S.D.J.

-15-

| | | wishes to speak at the hearing, the request to speak must be included in the letter to the Court ( signed by Judge Denny Chin ); Copies mailed. (jp) Modified on 07/06/1999 (Entered: 07/02/1999) |
|---|---|---|
| 09/24/1999 | 61 | ORDER approving Stipulation of Settlement and Final Judgment; that the Settlement is approved and adopted as a judgmment of this court; that plaintiffs' claims against the defendants are dismissed with prejudice; and that the Court will retain jurisdiction over this action in accordance with the terms of the Settlement. ( signed by Judge Denny Chin ); Mailed copies and notice of right to appeal; Entered on: 9/27/99 (pl) (Entered: 09/27/1999) |
| 09/24/1999 | | Case closed (pl) (Entered: 09/27/1999) |
| 09/30/1999 | 62 | STIPULATION and ORDER of Settlement, that plaintiffs' claims shall be resolved without further litigation by the entry of a final judgment incorporating the terms of this Stipulation, following its approval by the Court after notice of its terms are provided to the class, as set forth in this Stipulation ; Plaintiffs claims in paragraphs "44" through "47" of their complaint, regarding police vans, are withdrawn without prejudice . (signed by Judge Denny Chin) (ri) (Entered: 10/04/1999) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/06/2015 16:27:53 | | | |
| PACER Login: | as1929:2903347:0 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:92-cv-02132-DC |
| Billable Pages: | 7 | Cost: | 0.70 |