**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CORALYN GRUBBS, LEWIS SMITH, AL RIVERA, and SEAN MILLER, individually and on behalf of all other persons similarly situated, <br><br>                Plaintiffs, <br><br>               v. <br><br> HOWARD SAFIR, in his official capacity as Police Commissioner of the City of New York; NEW YORK CITY POLICE DEPARTMENT; BERNARD KERIK, in his official capacity as Commissioner of Correction of the City of New York; NEW YORK CITY DEPARTMENT OF CORRECTION; RUDOLF GIULIANI, in his official capacity as Mayor of the City of New York; and THE CITY OF NEW YORK, <br><br>               Defendants. | Case No. 92-CV-2132 (GBD) |

---

### BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION SEEKING ENFORCEMENT OF THIS COURT'S ORDERS, MODIFIED INJUNCTIVE RELIEF, AND A FINDING OF CIVIL CONTEMPT

ANDREW EIBEL & ASHA SMITH
Chairs, Criminal Justice Section
New York County Lawyers Association
14 Vesey Street
New York, NY 10007
*Counsel for NYCLA*

ALFRED A. O'CONNOR
Litigation Counsel
New York State Defenders Association
194 Washington Ave., Suite 500
Albany, New York 12210
*Counsel for NYSDA*

RICHARD D. WILLSTATTER
Vice Chair, Amicus Curiae Committee
National Association of Criminal Defense
       Lawyers
Co-Chair, Amicus Curiae Committee

LINDA H. MARTIN
HILARY HARRIS KLEIN
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Ave, 31st Floor
New York, New York 10022
(212) 277-4021
hilary.klein@freshfields.com

*Counsel for Amici Curiae*

New York State Association of Criminal
      Defense Lawyers
200 Mamaroneck Avenue, Suite 605
White Plains, New York 10601
(914) 948-5656
*Counsel for NACDL and NYSACDL*

JANET MOORE
Co-Chair, Amicus Committee
National Association for Public Defense
For identification purposes only:
Associate Professor of Law
University of Cincinnati College of Law
2540 West Clifton Avenue
Cincinnati OH 45221-0040
(513) 600-4757
janet.moore@uc.edu
*Counsel for NAPD*

TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE....................................................................................1

PRELIMINARY STATEMENT ....................................................................................4

ARGUMENT ................................................................................................................8

I.    THE SIXTH AMENDMENT GUARANTEES OPEN AND UNINHIBITED ATTORNEY-CLIENT
      COMMUNICATIONS ............................................................................................8

II.   THE PRE-ARRAIGNMENT CONSULTATION BETWEEN ATTORNEY AND CLIENT IS A CRITICAL
      MEETING WITH BROAD CONSEQUENCES..........................................................9

      A.  Adequate Representation in Arraignments Requires an Attorney to Build Trust with
          His Client Within Minutes of Their First Meeting ...................................................10

      B.  The Advice Provided During Pre-Arraignment Consultation Informs Decisions with
          Far-Reaching Consequences .....................................................................................13

III.  THE PRESENCE OF CAMERAS IN ATTORNEY-CLIENT CONSULTATION BOOTHS PREVENTS
      FREE AND OPEN COMMUNICATION IN VIOLATION OF THE 6TH AMENDMENT AND THE
      SETTLEMENT ORDER ...........................................................................................16

      A.  The Presence of Cameras Has a Chilling Effect on Information Shared Between
          Client and Attorney.....................................................................................................17

      B.  Clients Are Justified in Feeling Inhibited from Communicating Freely by the
          Presence of Cameras ....................................................................................................19

IV.   THERE IS NO JUSTIFICATION FOR THE PRESENCE OF CAMERAS IN ATTORNEY-CLIENT
      CONSULTATION BOOTHS ....................................................................................21

CONCLUSION............................................................................................................23

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Grubbs v. Safir*,
No. 92-CV-2132, 1999 WL 20855 (S.D.N.Y. Jan. 13, 1999) ................................. 5, 8, 16, 18

*Rothgery v. Gillespie*,
554 U.S. 191 (2008) .................................................................................................................4

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008) ..................................................................................................21

*United States v. Elzahabi,*
No. 04-282, 2007 WL 1378415 (D. Minn. May 7, 2007) ............................................... 16, 20

*United States v. Levy*,
577 F.2d 200 (3d Cir. 1978) ............................................................................................. 8, 16

*United States v. Rosner*,
485 F.2d 1213 (2nd Cir. 1973), *cert. denied*, 417 U.S. 950 (1974) ..................................... 4, 8

*Weatherford v. Bursey*,
429 U.S. 545 (1977) ....................................................................................................*passim*

**Other Authorities**

AM. BAR ASS'N, ABA STANDARDS FOR CRIMINAL JUSTICE: COLLATERAL
SANCTIONS AND DISCRETIONARY DISQUALIFICATION OF CONVICTED PERSONS
11 (3rd ed. 2004) ...................................................................................................................15

AM. COUNCIL OF CHIEF DEF., POLICY STATEMENT ON FAIR AND EFFECTIVE
PRETRIAL JUSTICE PRACTICES 2 (2011) ...............................................................................14

Christopher Campbell et al., *Unnoticed, Untapped, and Underappreciated:
Clients' Perceptions of their Public Defenders*, 33 Behav. Sci. & L. 751
(2015) ......................................................................................................................................9

Christopher Zoukis, *Taping Inmate-Lawyer Conferences Stirs Outrage at Kansas
Prison*, *Kansas Prison*, Huffington Post (Feb. 24, 2017)
http://www.huffingtonpost.com/entry/taping-inmate-lawyer-conferences-stirs-
outrage-at-kansas_us_58b094fbe4b02f3f81e44707...........................................................21

CRIMINAL JUSTICE SECTION STANDARDS FOR THE DEFENSE FUNCTION §4-3.1 (Am.
Bar Ass'n 4th ed.) ................................................................................................................10

GENERAL REQUIREMENTS FOR ALL ORGANIZED PROVIDERS OF DEFENSE SERVICES
 TO INDIGENT DEFENDANTS §II.B.1(a) (amended 2011) (INDIGENT DEF. ORG.
 OVERSIGHT COMMITTEE) ,
 https://www.nycourts.gov/courts/AD1/Committees&Programs/IndigentDefOr
 gOversightComm/general%20_requirements.pdf.................................................................10

GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION §2.2 (NAT'L LEGAL AID
 AND DEFENDER ASS'N 2006) (last visited Apr. 16, 2017),
 http://www.nlada.org/defender-standards/performance-guidelines.....................................10

Janet Moore & Andrew L.B. Davies, *Knowing Defense*, 14 Ohio St. J. Crim. L.
 345 (2017).......................................................................................................................9

Jonathan D. Casper, *Did You Have a Lawyer When You Went to Court? No, I Had
 a Public Defender*, 1 Yale Rev. L. & Soc. Action 4 (1971)...................................13

Juliet Linderman, *Secret Recordings at St. John's Sheriffs Office Not Illegal, State
 Police Conclude*, Times-Picayune (Aug. 30, 2013, 12:10 AM),
 http://www.nola.com/crime/index.ssf/2013/08/allegations_that_st_john_sheri.
 html................................................................................................................................21

LINDSEY DEVERS, U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE ASSISTANCE, PLEA
 AND CHARGE BARGAINING: RESEARCH SUMMARY 1 (2001) .................................14

Marcus T. Boccaccini & Stanley L. Brodsky, *Characteristics of the Ideal
 Criminal Defense Attorney from the Client's Perspective: Empirical Findings
 and Implications for Legal Practice*, 25 L. & Psychol. Rev. 81, 115 (2001).........11

Margaret Colgate Love et al., *Collateral Consequences of a Criminal Conviction:
 Law, Policy and Practice* (2012) ..........................................................................15

Mark Mueller, *Listening Devices in Edison Police Headquarters Secretly
 Recorded Offices, Attorneys, Civilians*, New Jersey Advance (Dec. 15, 2013,
 12:09 AM),
 http://www.nj.com/news/index.ssf/2013/12/listening_devices_in_edison_polic
 e_headquarters_secretly_recorded_discussions_of_officers_attorneys.html.........21

Marla Sandys & Heather Pruss, *Correlates of Satisfaction Among Clients of a
 Public Defender Agency*, 14 Ohio St. J. Crim. L. 431 (2017)..................................9

Nick Pinto, *Bail is Busted: How Jail Really Works*, The Village Voice (Apr. 25,
 2012, 4:00 AM)...........................................................................................................14

N.Y. STATE UNIF. CT SYS., PART 1200: RULES OF PROF. CONDUCT R. 2.1 (2017),
 http://www.nycourts.gov/rules/jointappellate/NY-Rules-Prof-Conduct-
 1200.pdf........................................................................................................................17

Office of the Chief Clerk of N.Y.C. Criminal Court, Crim. Ct. City N.Y., 2015
    Ann. Rep. 22 (2016). ...........................................................................................................5

Ryan Buell et al., *Creating Reciprocal Value Through Operational Transparency*
    8 (Harvard Bus. Sch., Working Paper No. 14-115, 2015),
    http://www.hbs.edu/faculty/Publication%20Files/14-115_aee7737a-a405-
    46f1-85e9-67882dd95435.pdf ........................................................................................18

U.S. Dep't Of Justice, Bureau Of Justice Statistics Special Report:
    Defense Counsel In Criminal Cases 1 (2000),
    https://www.bjs.gov/content/pub/pdf/dccc.pdf ..............................................................10

U.S. Dep't of Justice, Office of the Inspector Gen., Supplemental Report
    on September 11 Detainees' Allegations of Abuse at the
    Metropolitan Detention Center in Brooklyn, New York 31 (2003) ..........................21

The New York County Lawyers Association, the New York State Defenders Association, the New York State Association of Criminal Defense Lawyers, the National Association for Public Defense, and the National Association of Criminal Defense Lawyers (collectively, the *"Amici"*) respectfully submit this brief as *amici curiae* in support of Plaintiffs' Motion Seeking Enforcement of this Court's Orders, Modified Injunctive Relief, and a Finding of Civil Contempt.


## INTERESTS OF AMICI CURIAE

The New York County Lawyers Association ("NYCLA") is a not-for-profit membership organization of approximately 8,000 members committed to applying their knowledge and experience in the field of law to the promotion of the public good and ensuring access to justice for all. Members engage in the representation of individuals throughout the New York City metropolitan area, including representation of individuals detained and arraigned in the Richmond County Criminal Court at 26 Central Avenue, Staten Island. For these reasons, NYCLA has a direct and vital interest in the issues before this Court. This brief has been approved by the NYCLA Executive Committee.

The New York State Defenders Association ("NYSDA") is a not-for-profit membership association of more than 1,800 public defenders, legal aid attorneys, 18-b counsel and private practitioners throughout the state. With funds provided by the state of New York, NYSDA operates the Public Defense Backup Center, which offers legal consultation, research, and training to nearly 6,000 lawyers who serve as public defense counsel in criminal cases in New York. Members engage in the representation of individuals throughout the New York City metropolitan area, including representation of individuals detained and arraigned in the

Richmond County Criminal Court at 26 Central Avenue, Staten Island. For these reasons, NYSDA has a direct and vital interest in the issues before this Court. This brief has been approved by the NYSDA Amicus Curiae Committee.

The New York State Association of Criminal Defense Lawyers ("NYSACDL") is a not-for-profit organization of more than 700 members who practice in the field of criminal defense in the State of New York. Founded in 1986, NYSACDL is dedicated to protecting the rights of criminal defendants through a strong, unified, and well-trained criminal defense bar. Members engage in the representation of individuals throughout the New York City metropolitan area, including representation of individuals detained and arraigned in the Richmond County Criminal Court at 26 Central Avenue, Staten Island. For these reasons, NYSACDL has a direct and vital interest in the issues before this Court. This brief has been approved by the NYSACDL Amicus Curiae Committee.

The National Association for Public Defense ("NAPD") is an association of more than 14,000 professionals who deliver the right to counsel throughout all U.S. states and territories. NAPD members include attorneys, investigators, social workers, administrators, and other support staff who are responsible for executing the constitutional right to effective assistance of counsel. NAPD's members are advocates in jails, in courtrooms, and in communities and are experts in theoretical best practices as well as in the practical, day-to-day delivery of services. Members engage in the representation of individuals throughout the New York City metropolitan area, including representation of individuals detained and arraigned in the Richmond County Criminal Court at 26 Central Avenue, Staten Island. For these reasons, NAPD has a direct and vital interest in the issues before this Court. This brief has been approved by the NAPD Amicus Committee, as authorized by the NAPD Executive Committee.

2

The National Association of Criminal Defense Lawyers ("NACDL") is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. NACDL was founded in 1958. It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers. NACDL is dedicated to advancing the proper, efficient, and just administration of justice. NACDL files numerous amicus briefs each year in the U.S. Supreme Court and other federal and state courts, seeking to provide amicus assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole. NACDL has a particular interest in this case as it seeks to preserve, protect, and defend the Sixth Amendment right to counsel and to ensure that confidentiality of attorney-client communications remains sacrosanct. This brief has been approved by NACDL's Amicus Curiae Committee.

As membership organizations representative of criminal defense attorneys in New York and nationally, the *Amici* have an interest in any measures that impact or affect the provision of legal services by counsel to individuals detained in New York City courthouses. If allowed to remain, the presence of cameras within the Richmond County Courthouse's pre-arraignment attorney-client consultation booths ("attorney-client booths") will continue to inflict irreparable harm on clients in Richmond County, and set dangerous precedent for other jurisdictions in New York and throughout the United States. Furthermore, the violation of this Court's orders and the public's trust by the Defendants the City of New York and the Department of Correction (together, the "City") has had a widespread impact upon the practice of members represented by

3

the *Amici*, and must not go unchecked. Accordingly, the *Amici* have an acute interest in ensuring these cameras are removed immediately and the City is held in civil contempt.

**PRELIMINARY STATEMENT**

The ability of an individual to consult privately and without inhibition with his attorney is fundamental to the right to counsel under the Sixth Amendment, and indispensable to a fair and equitable justice system. The Supreme Court has recognized that arraignments specifically are a crucial stage of litigation in which the individual's Sixth Amendment right to counsel must be guaranteed. *Rothgery v. Gillespie*, 554 U.S. 191, 215 (2008). The Second Circuit has further confirmed that "the essence of the Sixth Amendment right is, indeed, privacy of communication with counsel." *United States v. Rosner*, 485 F.2d 1213, 1224 (2nd Cir. 1973), *cert. denied,* 417 U.S. 950 (1974).

The presence of cameras in attorney-client booths of the Richmond County Courthouse obstructs the free and open communication between clients and their attorneys in violation of this Court's prior orders in this case, the 1999 Settlement Agreement, and the Sixth Amendment. The recent revelation that cameras have indeed been recording since October 2015, despite representations from the City that they were not, has sent shock waves through the legal defense community and requires that these cameras be removed immediately. To allow them to remain – regardless of any representations by the City (and its now-questionable reliability) on whether the cameras will be operable going forward – threatens irreparable harm to the constitutional rights of the more than 7,000 individuals processed annually through the arrest-to-arraignment

4

system at the Richmond County Courthouse.[1] The *Amici* strongly urge the Court to grant the relief sought in Plaintiffs' motion in its entirety to prevent any future harm and to hold the City accountable for violating the Court's orders and for its prior misrepresentations.

Plaintiffs filed this class action in 1992, before the construction of the new Richmond County Courthouse at issue in this action. Plaintiffs alleged that the lack of private attorney-client interview facilities in Richmond County violated the Sixth Amendment right to counsel of persons awaiting arraignments or appearances in criminal proceedings in New York. This Court upheld Plaintiffs' Sixth Amendment claims on summary judgment, finding that "[t]he assistance of counsel would be rendered meaningless if that counsel's client were to be inhibited from speaking openly and freely." *Grubbs v. Safir*, No. 92-CV-2132, 1999 WL 20855 at *7 (S.D.N.Y. Jan. 13, 1999). Before a trial could be held to determine an appropriate remedy, however, the parties reached a settlement agreement pursuant to which the City agreed to provide attorney-client booths that allow clients to "consult privately" with their attorneys. (ECF No. 61, ¶ 11 (the "1999 Settlement Order")) The settlement agreement was so-ordered by the Court on September 24, 1999. *Id.*

On September 28, 2015, the City opened the new Richmond County Courthouse at 26 Central Avenue, Staten Island, with four attorney-client booths, each containing surveillance cameras facing the detainee's side. After the City refused a request by attorneys for the Legal Aid Society to remove the cameras, the Plaintiffs asked this Court to reopen this case, seeking a preliminary injunction. Granted on October 20, 2015, the Court's order required the City to refrain from "continuous minute-by-minute recording or monitoring by camera of attorney-client private consultations." (ECF No. 82) During oral argument, the Court also confirmed on the

---

[1]    Office of the Chief Clerk of N.Y.C. Criminal Court, CRIM. CT. CITY N.Y., 2015 ANN. REP. 22 (2016).

record that the continuous operation of the cameras "very possibly" violated the 1999 Settlement Order and the Sixth Amendment. (ECF No. 89) The Court subsequently so-ordered a November 4, 2015 Joint Letter from the parties in which the City agreed to enter settlement negotiations and represented that it would "refrain from any video monitoring or recording in the pre-arraignment attorney-client interview rooms in the Richmond County Courthouse, unless otherwise ordered by the Court." (ECF No. 88)

After settlement discussions failed in February 2016 without resolution, the City did not seek relief from this Court's October 20, 2015 and November 4, 2015 Orders enjoining operation of the cameras until the City, on January 12, 2017, filed a now-withdrawn Motion and Request for Oral Argument. (Declaration of Hilary Harris Klein ("Klein Decl."), Ex. A)[2] During the intervening time period, the City repeatedly represented that the cameras in the Richmond County Courthouse interview booths (and cameras installed in similar facilities in other boroughs), remained switched off. (Aff. of Justine M. Luongo in Support of Plaintiffs' Motion Seeking Enforcement of this Court's Orders, Modified Injunctive Relief, and a Finding of Civil Contempt, ECF No. 102, ¶¶ 9, 10) These contentions were repeated in the City's brief in support of their now-withdrawn motion: "[T]he City (including the DOC) continues to honor such Orders [enjoining operation of the cameras]." (Klein Decl., Ex. B (Memorandum of Law in Support of Defendant City of New York's Motion for an Order of Declaratory Relief, Or Alternatively, If the Court Rules that the Prison Litigation Reform Act Does not Apply, For an Order Dissolving the Preliminary Injunctive Relief Orders (the "Withdrawn Memorandum of

---

2   The City's motion was provisionally filed under seal and therefore does not appear on the docket. It has been included as Exhibit A to the Klein Declaration.

6

Law"), p. 4))[3] In the Withdrawn Memorandum of Law, the City also set forth its intention to expand the use of cameras and masking technology to other courthouses. (Klein Decl., Ex. B (the Withdrawn Memorandum of Law, p. 17)

On February 27, 2017, the City abruptly withdrew its Motion for an Order of Declaratory Relief without explanation. Then, on March 2, counsel for the City informed Plaintiffs' counsel that each of the four cameras at issue has been on and recording for at least some period of time between this Court's October 20, 2015 Order and February 17, 2017. The City further confirmed that one of the cameras was continuously recording between November 20, 2015 and June 20, 2016, and possibly again thereafter. (*See* Memorandum of Law in Support of Plaintiffs' Motion Seeking Enforcement of This Court's Orders, Modified Injunctive Relief, and a Finding of Civil Contempt, ECF No. 103, pp. 7-8)

Plaintiffs have submitted extensive arguments as to why the City's use of cameras has violated the Court's orders and merits a finding of contempt and award for sanctions. We fully support and agree with those arguments, and do not repeat them here. Rather, *Amici* will focus on demonstrating that (i) the presence of cameras has inhibited, and continues to inhibit, pre-arraignment consultations between attorneys and clients which are of critical importance, (ii) the presence of cameras has a chilling effect upon clients' communications with their attorneys in violation of the Sixth Amendment and the 1999 Settlement Order, and (iii) there is no adequate justification for the installment or use of cameras in attorney-client booths. For these reasons, the *Amici* respectfully request that this Court grant Plaintiffs' motion in its entirety, and order the

---

[3]   The Withdrawn Memorandum of Law was likewise provisionally filed under seal and does not appear on the docket. A redacted version has been included as Exhibit B to the Klein Declaration.

immediate removal of the cameras in attorney-client booths of the Richmond County Courthouse.

**ARGUMENT**

**I.    THE SIXTH AMENDMENT GUARANTEES OPEN AND UNINHIBITED ATTORNEY-CLIENT COMMUNICATIONS**

The right to consult with one's attorney privately and free from governmental intrusion is a core protection conferred by the Sixth Amendment's guarantee of effective assistance of counsel. *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973) ("[T]he essence of the Sixth Amendment right is . . . privacy of communication with counsel."); *United States v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978) ("Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful."). As the Supreme Court has recognized, this protection encompasses not only affirmative intrusions on attorney-client communications, but also those measures, such as electronic surveillance, which "inhibit[] . . . free exchanges between defendant and counsel" by creating a "fear of being overheard." *Weatherford v. Bursey*, 429 U.S. 545, 554, n.4 (1977). Indeed, as Judge Chin recognized in this case more than 17 years ago, "[t]he assistance of counsel would be rendered meaningless if that counsel's client were to be inhibited from speaking openly and freely." *Grubbs*, 1999 WL 20855 at *7.

Empirical research also supports the crucial importance of full and open attorney-client communication. Defense lawyers emphasize that communication is the foundation upon which

8

effective representation rests,[4] as do the individuals who need defense lawyers and who stand to pay the costs when open and complete communication is hindered:

> The only time you see [the public defender] is when you get locked up. The next time you see him you're standing in front of the judge and he's telling you to "sign this." . . . I'm signing away my life. I mean, is there any way I could have got this reduced or maybe even got it dismissed? Because I don't know. How would you know that if you don't have any dialogue with your public defender about what's really going on and what's in your best interest for you to do with this thing?[5]

The mere presence of cameras in the pre-arraignment attorney-client interview booths of the Richmond County Courthouse presents precisely such an obstacle to detainees' exercise of their Sixth Amendment rights. As discussed further in Section III below, the City's recent admission that the cameras have been on and recording – in defiance of this Court's orders to the contrary and its own prior representations – makes it all the more imperative that this Court issue an order remedying the violation by requiring the removal of the cameras.

## II.    THE PRE-ARRAIGNMENT CONSULTATION BETWEEN ATTORNEY AND CLIENT IS A CRITICAL MEETING WITH BROAD CONSEQUENCES

Forcing clients to seek pre-arraignment consultation with their attorneys under the glare of cameras obstructs the right to counsel at one of the most critical crossroads of the criminal justice system. The pre-arraignment meeting is when the basis of the attorney-client relationship is formed, crucial information is gathered, and high-stakes decisions are made. In many cases,

---

[4]   *See* Janet Moore & Andrew L.B. Davies, *Knowing Defense*, 14 Ohio St. J. Crim. L. 345, 362-363 (2017).
[5]   Christopher Campbell et al., *Unnoticed, Untapped, and Underappreciated: Clients' Perceptions of their Public Defenders*, 33 Behav. Sci. & L. 751, 763 (2015); *see also* Marla Sandys & Heather Pruss, *Correlates of Satisfaction Among Clients of a Public Defender Agency*, 14 Ohio St. J. Crim. L. 431 (2017) (demonstrating the importance of attorney-client communication to people who need public defense lawyers).

particularly the high proportion of criminal cases that involve public defenders[6] and cases with non-felony charges, this may be the only meeting that ever takes place between a defense attorney and her client. It is unreasonable and unconstitutional to require attorneys and clients to conduct these vital communications in front of a camera with nothing but the City's now-questionable assurances that the cameras will not be recording or that any footage obtained will not be used against them.

A.    Adequate Representation in Arraignments Requires an Attorney to Build Trust with His Client Within Minutes of Their First Meeting

Building trust with a client is one of the most important and most difficult parts of a defense attorney's job. A broad group of organizations provide practice standards that emphasize the need to establish open and honest communication with clients at the initial meeting. For example, the ABA's Criminal Justice Section Standards instruct that "[d]efense counsel should work to establish a relationship of trust and confidence with the accused,"[7] and the National Legal Aid and Defender Association's Performance Guidelines for Criminal Defense Representation advise that "Counsel should ensure at this and all successive interviews and proceedings that barriers to communication . . . be overcome."[8]

---

[6]    *See, e.g.*, U.S. Dep't Of Justice, Bureau Of Justice Statistics Special Report: Defense Counsel In Criminal Cases 1 (2000), https://www.bjs.gov/content/pub/pdf/dccc.pdf (estimating that eighty-two percent of criminal defendants in large State courts facing felony charges cannot afford to hire counsel).

[7]    Criminal Justice Section Standards for the Defense Function §4-3.1 (Am. Bar Ass'n 4th ed.)(last visited Apr. 13, 2017), http://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition.html.

[8]    Guidelines for Criminal Defense Representation §2.2 (Nat'l Legal Aid and Defender Ass'n 2006) (last visited Apr. 16, 2017), http://www.nlada.org/defender-standards/performance-guidelines/black-letter; *see also* General Requirements for all Organized Providers of Defense Services to Indigent Defendants §II.B.1(a) (amended 2011) (Indigent Def. Org. Oversight Committee) , https://www.nycourts.gov/courts/AD1/Committees&Programs/IndigentDefOrgOversightComm/general%20_re quirements.pdf (instructing that defense organizations require all lawyers be proficient in communication with clients).

10

In the course of a criminal case, developing trust during the crucial first minutes of a lawyer-client relationship can determine whether an attorney elicits information that allows her client to walk free. Within this single interview and under often tight time constraints, counsel must not only prepare for the forthcoming bail hearing, but must also gather enough information to (*i*) assess the strength of the prosecution's case, (*ii*) identify defenses, and (*iii*) consider potential procedural violations by the police and the prosecution that would support the successful suppression of evidence. This initial conversation informs a myriad of decisions in the case in addition to framing bail arguments, including arguments for dismissal, assessments of plea bargains, and whether to serve notice that the client wishes to testify or offer evidence before the Grand Jury in felony cases. In this formative time, criminal defendants place great weight on their attorney's perceived loyalty and client relations skills, and are "more open, honest, and assistive" to an attorney who possesses those skills.[9] For many individuals, especially indigent clients who are provided attorneys by the state, trust must be developed in a rushed pre-arraignment meeting in which they meet their attorney for the first, and perhaps only, time.

Even without the presence of cameras in attorney-client booths, establishing the requisite trust between attorney and client in these circumstances is an uphill battle. When defense attorneys meet their clients at the Richmond County Courthouse, for example, clients have typically been in the custody of the Department of Corrections for 18-24 hours,[10] and are often confused, afraid, frustrated, and sleep-deprived. During their time in custody, clients have no

---

[9]    Marcus T. Boccaccini & Stanley L. Brodsky, *Characteristics of the Ideal Criminal Defense Attorney from the Client's Perspective: Empirical Findings and Implications for Legal Practice*, 25 L. & Psychol. Rev. 81, 115 (2001).

[10]    *See What is Pre-Arraignment?*, The Legal Aid Society (last visited Apr. 17, 2017), http://www.legal-aid.org/en/ineedhelp/ineedhelp/criminalproblem/faq/whatispre-arraignment.aspx.

control over when or whether they get to eat or rest, and have lost almost all personal autonomy. Indigent individuals who step into an attorney-client booth are meeting an individual that they likely have never met and did not select to represent them. They are then advised that there is not much time, and asked to share personal details about their lives and answer questions regarding the charges against them; they are asked to do this with the knowledge that the following arraignment hearing and the subsequent progress of their case is likely to determine whether they will be set free in both the short and long term.

In this vulnerable state, many people are already not inclined to share openly with someone they have just met and did not choose themselves. Many clients express distrust of defense attorneys provided by the state, often because they perceive the attorneys as being in league with the prosecution, believe public defenders are not competent, or are simply aware of the resource limitations and heavy caseloads most public defenders are required to manage.[11] A strong driving force of this pre-disposed mistrust is that clients know that public defenders are paid by the government, and often perceive their assigned attorney as being part and parcel of the system that is working against them. One common misconception even holds that public defenders receive bonuses for taking plea deals. As the late criminal justice expert Jonathan Casper notes: "[A]t one point or another, most of the men interviewed either called the Public Defender the prosecutor or called the prosecutor the Public Defender. This is a subtle, but significant indication of the confusion of roles that these defendants perceived – the near

---

[11]    Campbell et al., *supra* note 5, at 762-64.

interchangeability of 'their' lawyer with the prosecutor."[12] Social scientists have documented numerous examples of this distrust in focus groups, including the following examples:

- "A public defender is just like the prosecutor's assistant. Anything you tell this man, he's not gonna do anything but relay it back to the public defender [sic: he means the prosecutor], they'll come to some sort of agreement, and that's the best you're gonna get. You know, whatever they come to and he brings you back the first time, well, you better accept it because you may get more."[13]

- "Take, for instance, . . . Mr. Watkins [the chief prosecutor in the district from which this man came]. Mr. Watkins runs his office, and Mr. Stankowski, the head Public Defender, he runs his office, but no one can't tell me that they're not on good terms or even friends. If not friends, they're . . . they've got a nice working arrangement . . . I think, in a sense, one hand washes the other."[14]

These examples illustrate that the work of the public defender to develop client trust is far from easy, and requires an environment that permits full and open communication.  The presence and use of electronic surveillance devices in the interview room irredeemably poisons that environment.

B.      The Advice Provided During Pre-Arraignment Consultation Informs Decisions with Far-Reaching Consequences

The efficacy of pre-arraignment consultation between attorney and client can influence the entire course of a client's case. The first meeting often involves making critical decisions, *e.g.,* whether or not to testify before a grand jury; whether to demand a jury trial; whether or not to plead guilty; and if so, to what charges. These decisions in turn impact the success of a defendant's case, whether the defendant is able to secure pre-trial release, the length of time the defendant may spend in jail or prison, and many other outcomes. Because of the volume of pleas

---

[12]   Jonathan D. Casper, *Did You Have a Lawyer When You Went to Court? No, I Had a Public Defender*, 1 Yale Rev. L. & Soc. Action 4, 7 (1971).
[13]   *Id.* at 6.
[14]   *Id.*

that take place immediately after the first meeting,[15] and the collateral consequences that may result from a guilty plea, the consequences of inadequate pre-arraignment consultation can have a ripple effect through the justice system and the course of a client's life. For this reason, "[i]nformed, reasonable, and constitutional pretrial release decision-making among all relevant criminal justice stakeholders is imperative to a just and effective criminal justice system."[16]

The inability to consult openly and freely with attorneys also presents the risk that clients will be unnecessarily subject to pretrial detention, which has been found in New York to "not only increase[] the likelihood of conviction, [but] also lessen[] the likelihood that the individual would be offered the opportunity to plead to a less severe charge."[17] In fact, pretrial detention has been found to be the "most significant factor contributing to a harsher outcome," including a greater chance of conviction and longer sentences.[18] The American Council of Chief Defenders has stated unambiguously that "counsel is crucial for bail determinations."[19]

Clients who are unable to consult meaningfully with their attorneys prior to arraignment also experience particular risks with regard to plea deals, which constitute ninety to ninety five percent of resolved cases at both the federal and state level.[20] If attorneys fail to learn crucial information that could catalyze a negotiated plea, clients lose viable plea deals to lesser charges. If clients are unable to consult with their attorneys regarding the facts of a case, and thereby

---

[15]  Over 25% of cases in Richmond County were disposed of by arraignment in 2015, the most recent year for which data is available. Office of the Chief Clerk of N.Y.C. Criminal Court, *supra* note 1, at 28. More than half of cases disposed of at arraignment are resolved by guilty plea. Nick Pinto, *Bail is Busted: How Jail Really Works*, The Village Voice (Apr. 25, 2012, 4:00 AM), http://www.villagevoice.com/news/bail-is-busted-how-jail-really-works-6434704.

[16]  AM. COUNCIL OF CHIEF DEF., POLICY STATEMENT ON FAIR AND EFFECTIVE PRETRIAL JUSTICE PRACTICES 2 (2011), https://www.pretrial.org/download/policy-statements/ACCD%20Pretrial%20Release%20Policy%20Statement%20June%202011.pdf.

[17]  *Id.* at 6.

[18]  *Id.*

[19]  *Id.* at 9.

[20]  LINDSEY DEVERS, U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE ASSISTANCE, PLEA AND CHARGE BARGAINING: RESEARCH SUMMARY 1 (2001), https://www.bja.gov/Publications/PleaBargainingResearchSummary.pdf.

determine the appropriate plea option, they risk agreeing to an inappropriately harsh plea deal with a myriad of collateral consequences. Finally, if clients feel inhibited in speaking candidly with their attorneys, they are unlikely to be forthcoming with additional relevant information – such as immigration status – that can determine the severity of collateral consequences and therefore weighs heavily in whether or not they take a plea deal or proceed to trial.

The American Bar Association recognizes that collateral consequences "can be the most important and permanent results of a criminal conviction."[21] Empirical research by legal scholars and social scientists amply supports that conclusion.[22] Where a plea deal includes a conviction, collateral consequences can include disenfranchisement, loss of professional licenses, deportation in the case of aliens, felon registration and ineligibility for certain public welfare benefits such as student loans, housing, and contracting.[23] These collateral consequences may apply indefinitely for the convicted person's lifetime.[24] Worse, "[t]o the extent [collateral consequences] occur outside the sentencing process, they may take effect without judicial consideration of their appropriateness in the particular case, without notice at sentencing that the individual's legal status has dramatically changed, and indeed without any requirement that the judge, prosecutor, defense attorney, or defendant even be aware that they exist."[25]

---

[21] AM. BAR ASS'N, ABA STANDARDS FOR CRIMINAL JUSTICE: COLLATERAL SANCTIONS AND DISCRETIONARY DISQUALIFICATION OF CONVICTED PERSONS 11 (3rd ed. 2004), http://www.americanbar.org/content/dam/aba/publishing/criminal_justice_section_newsletter/crimjust_standards_collateralsanctionwithcommentary.authcheckdam.pdf.

[22] *See, e.g.,* Margaret Colgate Love et al., *Collateral Consequences of a Criminal Conviction: Law, Policy and Practice* (2013).

[23] AM. BAR ASS'N, *supra* note 21, at 7; Sarah B. Berson, *Beyond the Sentence - Understanding Collateral Consequences*, Nat'l Inst. of Justice (last visited April 17, 2017), https://www.nij.gov/journals/272/Pages/collateral-consequences.aspx.

[24] AM. BAR ASS'N, *supra* note 21, at 7.

[25] *Id.* at 7-8.

Defendants risk devastating unanticipated consequences following arraignments. Failing to ensure their ability to consult privately with an attorney before this crucial hearing makes a mockery of the guarantee of effective counsel that has been repeatedly affirmed by the Supreme Court.

### III.   THE PRESENCE OF CAMERAS IN ATTORNEY-CLIENT CONSULTATION BOOTHS PREVENTS FREE AND OPEN COMMUNICATION IN VIOLATION OF THE 6TH AMENDMENT AND THE SETTLEMENT ORDER

The installation of cameras in attorney-client consultation booths directly contradicts the 1999 Settlement Order's requirement for "private" consultation booths (ECF No. 61, ¶ 11), this Court's prior ruling that assistance of counsel requires that clients not be inhibited from speaking "openly and freely" with their attorney (*Grubbs,* 1999 WL 20855 at *7), the Court's October 20, 2015 preliminary injunction and November 4, 2015 so-ordered stipulation that the cameras would not be turned on, and the Sixth Amendment. *See Levy,* 577 F.2d at 209 ("Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful.").

The mere presence of the cameras, coupled now with the ultimately inaccurate prior assurances these cameras were not recording, has a chilling effect on the communications between clients and attorneys that renders irreparable harm to representation, and prevents effective assistance of counsel. *See Weatherford,* 429 U.S. at 554, n.4; *United States v. Elzahabi, No. 04-282, 2007 WL 1378415 at *2* (D. Minn. May 7, 2007) ("[F]urther [video] monitoring of defendant's communications with counsel, whether inadvertent or deliberate, whether seen or unseen, will be deemed a knowing intrusion on the attorney-client relationship in violation of

16

defendant's Sixth Amendment right to counsel."). Only the physical removal of these cameras will protect against further harm.

A.    The Presence of Cameras Has a Chilling Effect on Information Shared Between Client and Attorney

The presence of cameras adds a tremendous and unjustified barrier to the attorney-client relationship, one that even the most practiced attorneys can find insurmountable. By introducing a camera into the attorney-client booth, the City has now introduced an entirely new topic that must be discussed between attorney and client before the crucial information exchange can take place: *Is this conversation being recorded by that camera and will the camera's footage be used against me? Are you trying to get me to confess on camera so you can close this case?*

Precious time between attorney and client has been and continues to be diverted to discussing the presence of cameras within the attorney-client booths. The City's recent misrepresentations regarding the cameras now render this conversation far from straightforward or reassuring. Defense attorneys have an ethical obligation to be honest with their clients about the cameras and their recording capabilities. The New York Rules of Professional Conduct require attorneys to provide "candid" advice,[26] and to explain matters "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."[27] Defense attorneys must be honest that they cannot independently verify cameras are in fact turned off, and that they are relying entirely on the representations of the City that cameras are not recording and that recordings will not be used against their clients. Following the City's misrepresentations, attorneys must be honest in advising their clients that past representations by

---

[26]   N.Y. STATE UNIF. CT SYS., PART 1200: RULES OF PROF. CONDUCT R. 2.1 (2017), http://www.nycourts.gov/rules/jointappellate/NY-Rules-Prof-Conduct-1200.pdf.
[27]   *Id.* at R. 1.4(b).

the City regarding the cameras have turned out to be false, and that conversations between attorneys and their clients have in fact been recorded.

Clients have no independent method of confirming that they are not being recorded by cameras pointed at them in the attorney-client booth. Likewise, a client has no way of verifying whether audio is in fact being recorded, or the extent that any "masking" technology is actually being applied to recordings. Instead, a client's decision of whether he can communicate freely and openly with his attorney will rest entirely upon the representations made by the City, via sign or otherwise, and the explanation of his attorney as described above. Following such unsatisfactory reassurances, it is difficult to see how anyone, much less an individual in the custody of the City, would feel they could speak "openly and freely" with their attorneys, as this Court has directed.[28] The result is a chilling effect on the information clients feel they can provide to their attorneys, in violation of the Sixth Amendment. *See Weatherford*, 429 U.S. at 554, n.4. ("One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard.").

It has been well-documented that people change their behavior in the presence of cameras, and specifically that individuals censor their behavior when they believe they are being watched.[29] While having potentially favorable consequences in the public sphere, the introduction of cameras within what should be private attorney-client consultations has the effect of obstructing the very purpose of these interactions. The first client interviewed by Legal Aid in

---

[28]  *Grubbs*, 1999 WL 20855 at *7.

[29]  For example, food service employees alter their performance when they are visible to customers via videoconferencing software, even without audio capability. *See* Ryan Buell et al., *Creating Reciprocal Value Through Operational Transparency* 8, 16 (Harvard Bus. Sch., Working Paper No. 14-115, 2015), http://www.hbs.edu/faculty/Publication%20Files/14-115_aee7737a-a405-46f1-85e9-67882dd95435.pdf.

the newly opened Richmond County Courthouse was distressed at learning he was being filmed: he immediately stated "this is wrong," covered his head and moved under the camera to block himself from view, and felt he could not communicate freely with his attorney. (Aff. of F.V. in Support of Plaintiff's Application, ECF No. 76-1, ¶ 5-7; Aff. of Christopher Pisciotta in Support of Plaintiffs' Application, ECF No. 76-2, ¶ 25) Attorneys feel similar inhibitions when attempting to conduct pre-arraignment interviews, potentially altering their own questions and practices out of the concern the conversation might be overheard and used against their clients. (*See* Aff. Of Kevin P. McKernan in Support of Plaintiffs' Application, ECF No. 77-2, ¶¶ 7-8 ("I was concerned that any conversation I had with my client could be observed and or [sic] overheard due to the presence of the technology in the interview area [and] those concerns inhibited me from conducting a full and complete interview of my client as I was again concerned that any statement of my client could be used and subsequently noticed by the District Attorney. . . .")) These effects alone merit the complete removal of cameras from attorney-client booths in the Richmond County Courthouse.

> B. Clients Are Justified in Feeling Inhibited from Communicating Freely by the Presence of Cameras

As recent events evidence, the caution a client would feel before speaking openly and freely to his attorney under the gaze of a camera operated by the City is entirely justified. In light of the City's repeated misrepresentations to this Court and the Legal Aid Society, it is entirely understandable that clients being prosecuted by the City would question or doubt similar representations made to them about what is being recorded by cameras and how these recordings might be used, and be chilled in their communications to counsel as a result. Courts have recognized this chilling effect as well.

The Supreme Court has recognized that the "fear of being overhead" inhibits free exchanges between defendant and counsel and presents a "threat to the effective assistance of counsel" protected by the Sixth Amendment. *Weatherford*, 429 U.S. at 554, n.4. Furthermore, the Supreme Court has recognized that the possibility of electronic surveillance is a greater threat than even the presence of a third party near the consultation area: "[A] fear that some third party may turn out to be a government agent will inhibit attorney-client communication to a lesser degree than the fear that the government is monitoring those communications through electronic eavesdropping." *Id.*

Courts have more recently recognized the chilling effect of prison monitoring. *See Elzahabi,* 2007 WL 1378415 at *2 ("The Court . . . agrees that defendant's awareness of the prison monitoring may have a tendency to discourage the spirit of candor that is at the heart of the attorney-client privilege. [ . . . ] The mere possibility that defendant's conversations are being recorded may now impede his willingness to communicate openly with counsel.") The court's warning to the prosecution in *Elzahabi* is particularly instructional. There, although finding no Sixth Amendment violation for cameras present in the recreation room and cell of the Defendant, the court did warn that the "prosecution is now clearly on notice of defendant's legitimate concern" and that "any further monitoring of defendant's communications with counsel, whether inadvertent or deliberate, whether seen or unseen, will be deemed a knowing intrusion on the attorney-client relationship in violation of defendant's Sixth Amendment right to counsel." *Elzahabi,* 2007 WL 1378415 at *2.

Here, the City has installed cameras directly in the attorney-client booths, not in a common area. It has been on notice since 2015 of Plaintiffs' concerns about recordings, yet recordings have still been made. This is a knowing intrusion on the Sixth Amendment rights of

clients detained in the Richmond County Courthouse, and it has created a justified belief that future recordings may be made, regardless of any representation by the City to the contrary. The only sufficient remedy is the complete removal of cameras in the attorney-client interview booths.[30]

## IV.   THERE IS NO JUSTIFICATION FOR THE PRESENCE OF CAMERAS IN ATTORNEY-CLIENT CONSULTATION BOOTHS

In their Withdrawn Memorandum of Law, Defendants stated their justifications for installing cameras included the need to capture "medical emergencies, physical incidents between two or more people, detainee use of contraband substances, detainees sleeping in the booth, etc. . . ." (Klein Decl., Ex. B, p. 1) These purported justifications for monitoring private attorney-client consultations are misguided at best and illegitimate post-hoc justifications for recording confidential conversations at worst. In any event, these purported justifications are insufficient to justify the Sixth Amendment violation of installing cameras in attorney-client

---

[30] Any argument that recordings were made inadvertently or by a "fluke" is not persuasive. The actions by the City are, unfortunately, neither rare nor anomalous in the U.S. criminal justice system. As recently as January 2017, inmates in Kansas filed a class action suit when it was revealed the prison where they were held had secretly recorded over 700 attorney-client conferences during a 12-week period. *See* Christopher Zoukis, *Taping Inmate-Lawyer Conferences Stirs Outrage at Kansas Prison*, Huffington Post (Feb. 24, 2017), http://www.huffingtonpost.com/entry/taping-inmate-lawyer-conferences-stirs-outrage-at-kansas_us_58b094fbe4b02f3f81e44707. In 2003, staff members of the Metropolitan Detention Center in Brooklyn were found by the Department of Justice to have secretly and unlawfully audiotaped detainees' visits with their attorneys. U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GEN., SUPPLEMENTAL REPORT ON SEPTEMBER 11 DETAINEES' ALLEGATIONS OF ABUSE AT THE METROPOLITAN DETENTION CENTER IN BROOKLYN, NEW YORK 31 (2003), https://oig.justice.gov/special/0312/final.pdf. In 2013, a Police Chief in Edison, New Jersey made similar promises to those made by the City that microphones in surveillance cameras were disabled, all the while recording attorney-client conversations. Mark Mueller, *Listening Devices in Edison Police Headquarters Secretly Recorded Offices, Attorneys, Civilians*, New Jersey Advance (Dec. 15, 2013, 12:09 AM), http://www.nj.com/news/index.ssf/2013/12/listening_devices_in_edison_police_headquarters_secretly_recorded_discussions_of_officers_attorneys.html**.** And a police sheriff in Louisiana also secretly recorded attorney-client conversations until his actions were exposed by a whistleblower. Juliet Linderman, *Secret Recordings at St. John's Sheriff's Office Not Illegal, State Police Conclude*, Times-Picayune (Aug. 30, 2013, 12:10 AM), http://www.nola.com/crime/index.ssf/2013/08/allegations_that_st_john_sheri.html.

booths. *See U.S. v. Stein,* 541 F.3d 130 (2d Cir. 2008) (dismissing defendants' indictments following Sixth Amendment violations because "the government has failed to establish a legitimate justification . . . ."). As illustrated above, any potential benefit provided by the presence of cameras – of which there is none – is far outweighed by the harm they inflict.

Attorney-client booths are for the use of one-on-one attorney client consultations, requiring the presence of one attorney and one client only, and are conducted with a physical barrier between the two. Physical incidents between two or more people, or a client sleeping in the booth (*see, e.g.,* Klein Decl., Ex. B, p. 1), are situations that are neither contemplated nor likely during attorney-client consultation. Similarly, medical emergencies do not require camera monitoring to be brought to the attention of DOC staff, as an attorney can easily (and likely more swiftly) call attention to any client in distress. Finally, the implication that clients would use or receive contraband substances during an attorney-client consultation is simply unfounded and contrary to the treatment of attorneys as officers of the Court.

That any of these occurrences could happen when an attorney-client consultation is not in progress is easily remedied: the City can ensure these booths are used only for the purpose for which they were constructed by regulating inmate entrance to the booths. The *Amici* are not aware of any justification causing camera surveillance to be the only way to address the City's purported concerns. It belies logic – and would be concerning for other reasons – that correction officers cannot dictate and keep track of the location of detainees within their custody or find other means of restricting access to these booths. Courthouses have implemented such measures, for example by allowing attorneys to control the unlocking of the client-side booths to facilitate attorney-client consultations and restrict access. (*See* Aff. of Justine Luongo in support of Plaintiffs' Application, ECF No. 77-1, ¶ 7 (reporting that the Kings County Criminal Courthouse

implements "a lock between the holding cell and the interview room, which is controlled by the attorney on the other side of the interview booth."))[31] There is no legitimate justification for placing cameras in attorney-client booths, and they should be removed immediately.

## CONCLUSION

The continued presence of cameras in pre-arraignment attorney-client booths imposes an unreasonable, unjustified and unconstitutional infringement on the Sixth Amendment rights of individuals detained in the Richmond County Courthouse. The mere presence of cameras, coupled with the City's inability to provide adequate assurances regarding their use, deters clients from consulting openly and freely with their attorneys. Clients are thereby prevented from exercising their constitutionally guaranteed rights at a time when assistance of counsel is crucially important. The only adequate remedy is the removal of the cameras from the attorney-client interview booths. For these reasons, the *Amici* respectfully request that this Court grant Plaintiffs' motion in its entirety.

---

[31] Even if these justifications had merit – which they do not – and less restrictive means for addressing them did not exist, it is hard to imagine how camera recordings implementing the "masking" technology previously proposed by the City would effectively address Defendants' purported concerns at all. (*See* Klein. Decl., Ex. B (the Withdrawn Memorandum of Law, pp. 4-5) (describing the masking technology)). A client could evade detection by staying within the "masked" area of the screen. Even if some action were caught outside of the "masked" area, the fact that a camera recording is only partial and likely would not capture all of an incident, for example a use-of-force incident raises a myriad of potential evidentiary concerns that might vitiate any use these cameras could have as evidence.

23

April 17, 2017

Respectfully Submitted,

FRESHFIELDS BRUCKHAUS DERINGER US LLP

BY: /S/ HILARY HARRIS KLEIN
LINDA H. MARTIN
HILARY HARRIS KLEIN
601 Lexington Ave, 31st Floor
New York, New York 10022
(212) 277-4021

*Counsel for Proposed Amici Curiae*

ANDREW EIBEL & ASHA SMITH
Chairs, Criminal Justice Section
New York County Lawyers Association
14 Vesey Street
New York, NY 10007

*Counsel for NYCLA*

ALFRED A. O'CONNOR
Litigation Counsel
New York State Defenders Association
194 Washington Ave., Suite 500
Albany, New York 12210

*Counsel for NYSDA*

RICHARD D. WILLSTATTER
Vice Chair, Amicus Curiae Committee
National Association of Criminal Defense
        Lawyers
Co-Chair, Amicus Curiae Committee
New York State Association of Criminal
        Defense Lawyers
200 Mamaroneck Avenue, Suite 605
White Plains, New York 10601
(914) 948-5656

*Counsel for NACDL and NYSACDL*

24

JANET MOORE
Co-Chair, Amicus Committee, National
Association for Public Defense
For identification purposes only:
Associate Professor of Law
University of Cincinnati College of Law
2540 West Clifton Avenue
Cincinnati OH 45221-0040
(513) 600-4757
janet.moore@uc.edu

*Counsel for NAPD*