

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CAROLYN GRUBBS, LEWIS SMITH, ALI :
RIVERA, and SEAN MILLER, individually and on :
behalf of all other persons similarly situated,   :
                                           :

                      Plaintiffs,   :

           -against-   :

HOWARD SAFIR, in his official capacity as Police :
Commissioner of the City of New York; NEW :
YORK CITY POLICE DEPARTMENT; :
BERNARD KERIK, in his official capacity as :
Commissioner of Correction of the City of New :
York; NEW YORK CITY DEPARTMENT OF :
CORRECTION; RUDOLPH GIULIANI, in his :
official capacity as Mayor of the City of New York; :
and THE CITY OF NEW YORK, :

                    Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM
DECISION AND ORDER**

92 Civ. 2132 (GBD)

GEORGE B. DANIELS, United States District Judge:

    In 1992, Plaintiffs brought this action on behalf of a class of persons being held in New York City police precincts, central booking facilities, and criminal court buildings alleging, *inter alia*, violations of their Sixth Amendment Rights. *Grubbs v. Safir*, No. 92 Civ. 2132 (DC), 1999 WL 20855, at *1 (S.D.N.Y. Jan. 15, 1999). Plaintiffs claimed that their constitutional rights were violated by being denied a space to privately consult with their criminal defense attorney. Defendants are the City of New York and various named City officials. In 1999, the parties reached a settlement (the "1999 Settlement"), through which the City committed to various forms of remediation, including the use of best efforts to install interview booths for pre-arraignment detainees to consult privately with counsel in a courthouse in Staten Island (the "Old SI Courthouse"). (Settlement, ECF No. 61.)

There are now two motions pending before this Court.  First, Defendants have moved pursuant to 28 U.S.C. § 2201 for an order declaring that the City's proposed revised plan (the "New Plan") for the use of the video cameras with masking technology in the interview booths at the Richmond County Criminal Court ("RCCC") is legally sufficient, and also for an order pursuant to Federal Rule of Civil Procedure 65 dissolving this Court's October, (Oct. 30 Preliminary Injunction Order Order, ECF No. 86), and November Injunctive Orders, (Nov. 4 Order, ECF No. 88.)  (Defs.' Mot., ECF No. 131.)  Second, Plaintiffs filed a motion seeking enforcement of this Court's Orders, modified injunctive relief to require the physical removal of the cameras, and a finding of civil contempt based on the City's violations of the Orders.  (Pls.' Mot., ECF No. 103.)  That portion of Defendants' motion for declaratory relief, finding legally sufficient the City's current proposed plan, and a dissolution of this Court's October and November Orders is GRANTED.  Plaintiffs' motion to modify those Orders to require the removal of all surveillance cameras from the attorney-client interview booths in the RCCC, and to hold Defendants in civil contempt is DENIED.

## I.   PROCEDURAL HISTORY

Plaintiffs brought this lawsuit in 1992, "seeking declaratory and equitable relief to change the conditions of confinement to which they were subjected from the time of their arrest until their arraignment, and in some instances, when produced from jail to court for post-arraignment court proceedings in their criminal cases."  (Settlement at 1.)  Among other claims, the original complaint alleged that "pre-arraignment detainees who were arrested in Queens and Richmond Counties were denied an opportunity to privately consult with counsel . . . ." (*Id.* at 1–2.) Plaintiffs' class includes, among others, "all persons who are held by the City Defendants in police precincts,

central booking facilities and criminal court buildings in New York City while waiting their arraignment . . . ." (*Id.* at 3.)

The parties eventually reached a settlement in 1999 in which the City committed to undertake various remedial measures concerning detainees in various facilities. (*See generally id.*) One of those remedial measures included the City's promise to "use its best efforts to construct or install, by August 31, 1999, an interview booth for pre-arraignment detainees to consult privately with counsel" in the Old SI Courthouse, which at the time was located on 67 Targee Street, Staten Island, New York. (*Id.* at 10.)

In September 2015, the City opened the RCCC in Staten Island, which replaced, among other courts, the Old SI Courthouse. (Pls.' Mot. at 4.) The City installed video surveillance cameras that have the ability to monitor and record the detainee's side of the pre-arraignment interview booths at the RCCC. (*Id.*) Plaintiffs claimed that this was a violation of the Constitution and the 1999 Settlement. (*See id.*) On October 20, 2015, upon Plaintiffs' motion for preliminary injunction, this Court temporarily enjoined Defendants "from continuous minute-by-minute recording or monitoring by camera of attorney-client private consultations at the Richmond County Criminal Court attorney-client interview rooms." (Oct. 20 Preliminary Injunction Order, ECF No. 82.)

In response, the City notified this Court in a letter on October 30, 2015, that it intended to resume the operation of the cameras "on an intermittent basis" so that the cameras would be "activated one minute on and one minute off." (Defs.' Oct. 30 Letter, ECF No. 83.) That same day, this Court expanded its original preliminary injunction order to temporarily restrain *any*

operation of the cameras and set a show-cause hearing for November 5 to determine whether a preliminary injunction should be entered to that effect. (Oct. 30 Preliminary Injunction Order.)

On November 4, 2015, this Court approved the parties' stipulation to adjourn the show-cause hearing providing "that in lieu of setting a [new] hearing date at this time, the parties [would] report back to the Court as to the status of their [settlement] discussion on or before November 25, 2015, [and that] [i]n the interim, Defendants [would] continue to refrain from any video monitoring or recording in the pre-arraignment attorney-client rooms in the Richmond County Courthouse, unless otherwise ordered by the Court." (Nov. 4 Order.) During these settlement discussions, Defendants gave multiple assurances that "until the matter was settled, they would not turn the cameras back on." (Aff. of Justine Luongo ("Luongo Aff."), ECF No. 102, at ¶ 9.)

As part of the settlement discussions, Defendants began experimenting with masking technology for the cameras. The masking technology has several features designed to protect the privacy of attorney-client communications: First, the cameras would not capture any audio. (Defs.' Mot. at 6.) Second, the cameras would only capture the detainee's side of the booth. (*Id.* at 7.) Third, "camera coverage . . . [would] utilize masking technology to block the portion of the image of the booth where the detainee sits to speak with his/her attorney." (*Id.*) This privacy zone is where the detainee sits and no visual image of the detainee is captured. (*Id.*) A white box blocks out the detainee on the live feed. (*Id.*) The privacy zone is demarcated on the floor, and signs are posted in the booths to remind the detainee of where to sit. (*Id.*) Fourth, recordings of any pre-arraignment meetings would be destroyed ninety days from the date of the recording, unless the

DOC is notified of a recorded incident such as officer use of force or inmate-on-inmate violence. (*Id.* at 17.)

Over a year later, in January 2017, the City moved for declaratory relief, or, alternatively, an order dissolving the October and November Orders (filed under seal). In February 2017, it was discovered that some of the cameras in the pre-arraignment attorney-client interview rooms at the RCCC had been turned on and recorded footage of certain attorney-client interviews (without audio), since this Court's October 20 Preliminary Injunction Order. (Defs.' Mot. at 4.). Thereafter, the City withdrew its motion, advised Plaintiffs of its findings, and disconnected the cameras. (*Id.* at 5.)

In March 2017, Plaintiffs filed their current motion seeking, *inter alia*, an order requiring the removal of all surveillance cameras from the attorney-client interview rooms at the RCCC, to find the City of New York and the Department of Correction ("DOC") (collectively, the "City Defendants") in civil contempt, and to impose sanctions for the City's violation of this Court's Orders. In May, the City filed its current motion seeking an order declaring the City's New Plan, which includes masking technology, to be legally sufficient pursuant to the 1999 Settlement and the Sixth Amendment.

## II.   LEGAL STANDARDS

### A.   Sixth Amendment

The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.   "[I]nmates must have a reasonable opportunity to seek and receive the assistance of attorneys." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *partially overruled by Thornburgh v. Abbott*, 490 U.S. 401 (1989).   While the attorney-client privilege has

not been elevated to the level of a constitutional right, the ability for an attorney to communicate privately and freely with his client is key to the constitutional guarantees of the right to effective assistance of counsel. *See United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973).

Nonetheless, not every intrusion of the attorney-client privilege constitutes a constitutional violation. As the Second Circuit has stated, in evaluating whether a pre-trial detainee's right to counsel has been impaired, a court must determine whether the challenged conduct or restriction "unjustifiably obstruct[s]," "unreasonably burden[s]" or "interfere[s]" with the detainee's access to counsel. *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cr. 2001) (internal citations omitted). However, "even when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Many courts have held that the mere monitoring of an attorney-client meeting or conversation, whether visually or even aurally, without more, does not constitute a Sixth Amendment violation. *See, e.g., Carr v. Tousley*, No. CV–06–0125SJLQ, 2009 WL 1514661, at *33 (May 27, 2009) (refusing to find a Sixth Amendment violation even though the jail could and would audio and/or video monitor detainees' attorney visits because such monitoring was reasonable and served important penological interests); *Smith v. Peyton*, 276 F. Supp. 275, 277 (W.D. Va. 1967) (no constitutional violation found when attorney-client meeting took place in the presence of a prison guard who was present as a precautionary measure, but in no way interfered with the meeting).

**B.     The Prison Litigation Reform Act ("PLRA")**

The PLRA gives courts certain powers to grant appropriate remedies concerning prison conditions. The two remedies relevant to this case are the court's authority to grant prospective

relief and injunctive relief. For prospective relief in any "civil action with respect to prison conditions," such relief:

> shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

For preliminary injunctive relief, the PLRA grants courts the authority to enter a temporary restraining order or an order for preliminary injunctive relief in any "civil action with respect to prison conditions," but requires such relief also to be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Any preliminary injunctive relief granted in a case covered by the PLRA automatically expires 90 days after its entry, unless a court makes the findings required when granting prospective relief, pursuant to Section 3626(a)(1)(A), and finalizes the order before the expiration of the 90-day period. *Id.*

"Relief" is defined as "all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements." 18 U.S.C. § 3626(g)(9).

"Prospective relief" is defined as "all relief other than compensatory monetary damages[.]" 18 U.S.C. § 3626(g)(7).

A "civil action with respect to prison conditions" is defined as "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus

proceedings   challenging   the   fact   or   duration   of   confinement   in   prison[.]"
18 U.S.C. § 3626(a)(1)(A).

A "prison" is defined to include "any . . . local facility that . . . detains juveniles or adults
accused of . . . violations of criminal law[.]"  18 U.S.C. § 3626(g)(5).

## III.   DEFENDANTS' MOTION FOR DECLARATORY RELIEF IS GRANTED

Defendants' motion for a declaration that the City's New Plan is legally sufficient is
GRANTED because the proposed, revised plan is consistent with the 1999 Settlement and the
Sixth Amendment.

### A.   The City's New Plan Is Legally Sufficient Under The 1999 Settlement

This Court has the authority to order compliance with the 1999 Settlement.  It is well
established that "[a] federal court has jurisdiction to enforce a settlement agreement if the dismissal
order specifically reserves such authority or the order embodies the terms of the settlement."
*McLean v. Village of Sleepy Hollow*, 166 F. Supp. 2d 898, 901 (S.D.N.Y. 2001).  "Here, the
settlement terms were incorporated into the [1999 Settlement] that was so-ordered by this Court,"
thus giving rise to jurisdiction and this Court's ability to enforce the terms of the settlement. *Id.*;
(*see generally* Settlement.)  Furthermore, paragraph 24 of the 1999 Settlement provides that this
"Court shall retain jurisdiction over this action for the purpose of enforcing the provisions of this
Stipulation." (Settlement at 14.)[1]

The 1999 Settlement is also enforceable because it complies with the PLRA provisions
concerning a court's granting of prospective relief.[2]  As mentioned *supra*, the PLRA provides that

---

[1] Section 25 of the 1999 Settlement also provides that the "provisions of th[e] Stipulation shall terminate,
upon motion of any party or intervenor, two years after th[e] Stipulation is approved by the Court . . . ."
However, no party to date has moved to have this settlement terminated.

[2] The PLRA plainly applies to this case because this is a "civil action with respect to prison conditions" at
the RCCC.  The pre-arraignment booths at the RCCC constitute "prisons" as defined under the PLRA

for a court to order prospective relief in a "civil action with respect to prison conditions," the Court must find that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). In this case, the parties explicitly stipulated "based on the entire record, that the remedies set forth in th[e] Stipulation" satisfied the aforementioned requirements. (Settlement at 6.)

Paragraph 14 of the 1999 Settlement required the City to "use its best efforts to construct or install, by August 31, 1999, an interview booth for pre-arraignment detainees to consult privately with counsel" in the then-existing Old SI Courthouse.[3]   (Settlement at 10.)   It is a fundamental tenet of contract law that a "court's role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract.  If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further." *Maestro West Chelsea SPE LLC v. Pradera Realty Inc.*, 954 N.Y.S.2d 819, 825 (2012).  With respect to a best efforts clause, "[a] court must interpret and give effect to an express best efforts clause just as it would any other contractual provision." *Id.*

The City's New Plan is legally sufficient under the 1999 Settlement because the City's proposal would provide a space for private consultations with counsel at the RCCC.  Here, the plain language of the 1999 Settlement is devoid of any prohibition on the installation of video

---

because they are local facilities "that . . . detain[] juveniles or adults accused of . . . violations of criminal law[.]" 18 U.S.C. § 3626(g)(5).  Contrary to what Plaintiffs contend, pre-arraignment detainees are clearly individuals who have been *accused* of a crime.  Otherwise, these detainees, by logic, would not be entitled to Sixth Amendment protection since the Sixth Amendment applies specifically to those "accused" of crimes. *See Grubbs*, 1999 WL 20855, at *7 ("For [the Sixth Amendment] to have any meaning, the right to counsel must include an opportunity for plaintiffs to confer with counsel immediately prior to arraignment or any other court proceeding.").

[3] The City does not contest that the 1999 Settlement applies to the newly-built RCCC, completed in 2015. (Oral Arg. Tr. at 10:6–9.)

cameras in the pre-arraignment interview booths at the Staten Island courthouse.  The best efforts clause does not require the construction of an attorney-client booth *without* a camera, nor does installation of any camera in the booth constitutes a per se violation of the 1999 Settlement.  The 1999 Settlement also does not prohibit the monitoring and recording of all areas of the interview booth under all circumstances.  Rather, the term "best efforts" means best efforts to create a private area for consultations with counsel.[4]

The City's New Plan for the partial use of the cameras in the pre-arraignment attorney-client interview booths at the RCCC meets that requirement.  As indicated earlier, cameras in the booths will employ masking technology, which has several features designed to protect the privacy of attorney-client communications.  The technology captures the detainee's side of the booth only, and creates a privacy zone in which the detainee sits that does not capture any audio or visual image of the detainee or his communication. (Defs.' Mot. at 6–7.)  When combined, these features satisfy the City's obligations under the best efforts clause of the 1999 Settlement because they provide a space for private consultation with counsel.  The booth is otherwise monitored for

---

[4] This interpretation of the best efforts clause also comports with Judge Chin's findings in so ordering the 1999 Settlement in the original suit.  In adopting the settlement, Judge Chin was not addressing the subjective beliefs or impressions of the parties—whether, for example, the parties had confidence that the City was not eavesdropping, or whether, for example, there was a private space that the parties were convinced were private. *See Grubbs*, 1999 WL 20855, at *7.  Rather, what Judge Chin sought to address was the lack of private space for consultations in general. *Id.*  Thus, the Plaintiffs' argument that the City's New Plan violates the 1999 Settlement because the City cannot be trusted to utilize the cameras correctly (*e.g.*, without the use of any audio recording) is not only inconsistent with the plain language of the settlement, but also inconsistent with the intent of its best efforts clause.

security-related concerns, yet is still protected from unreasonable intrusions into the attorney-client relationship.

**B.      The City's New Plan Is Legally Sufficient Under The Sixth Amendment**

The City's New Plan is also legally sufficient under the Sixth Amendment because the New Plan serves a legitimate purpose and does not unjustifiably obstruct access to counsel.

**i.      The City's New Plan Serves a Legitimate Purpose**

As mentioned *supra*, in evaluating whether, as a pre-trial detainee, Plaintiffs' right to counsel has been impaired, this Court must determine whether the challenged restrictions in question unjustifiably obstruct, unreasonably burden, or interfere with the right of access to counsel, "in light of the central objective of prison administration, safeguarding institutional security." *Wolfish*, 441 U.S. at 547.  Thus, the first step in the analysis is to examine and evaluate the City's objective of utilizing cameras in the interview booths at the RCCC for purposes of maintaining security at its detention facilities.  *See United States v. Ginsburg*, 758 F.2d 823, 833 (2d Cir. 1985) (noting the "legitimate" and "justifiable" purpose of the government's intrusion into the attorney-client relationship as a factor in upholding the district court's refusal to find a Sixth Amendment violation).

Here, the City's New Plan serves a legitimate, security purpose.  The City has listed several security-related concerns for utilizing cameras in the RCCC interview booths.  Among those concerns include the use of cameras to create a record of problematic incidents that may take place in the booths (*e.g.*, medical emergencies, use of contraband, use of force, etc.) and gather helpful

information so that the City can improve its protocols to minimize problematic incidents in the future.[5] (Defs.' Mot. at 16.)

Plaintiffs suggest that these security concerns should not be given much weight since the City has failed to offer evidence of "genuine" security issues that justify video surveillance of the interview booths. (*See* Pls.' Mot. at 20–22.) Most notably, Plaintiffs point out that since the RCCC opened in September 2015, there have been no documented instances of violence, use of force, or recovery or use of contraband in the attorney-client meeting rooms. (*Id.*) While this may be true, these types of security issues may arise in the future, and cameras may help minimize such occurrences. The RCCC has only been in operation now for approximately two years. In fact, the obvious presence of these cameras may be in part the very reason that detainees have been deterred from engaging in these types of behavior in the RCCC booths. Furthermore, the City has demonstrated that the "central objective" of its New Plan is to safeguard and improve the security of its detainment facilities, rather than eavesdrop on attorney-client interactions, by proposing to use video-only cameras (without audio) with masking technology that completely blocks out any physical movements or gestures by the detainee from appearing on the live feed. As a result, despite Plaintiffs' counterarguments, the City's New Plan serves an important penological purpose.

### ii.     The City's New Plan Does Not Unjustifiably Obstruct Access to Counsel

In light of the New Plan's legitimate purpose, the plan is also legally sufficient under the Sixth Amendment because it does not unjustifiably obstruct access to counsel. Many courts have found that the mere monitoring of attorney-client interactions, whether visually or even aurally, alone, does not constitute a Sixth Amendment violation. *See, e.g., Carr*, 2009 WL 1514661, at

---

[5] Defendants list other security-related concerns in their brief in redacted form. (*See* Defs.' Mot. at 15–16.)

*33; *Peyton*, 276 F. Supp. at 277. Rather, there must be some showing of harm, whether it be an unjustifiable obstruction of the attorney-client relationship or prejudice to the plaintiff. *See Patterson v. Ponte*, 16 Civ. 3156 (PAE) (JCF), 2017 WL 1194489, at *3 (S.D.N.Y. Mar. 30, 2017) (internal citation omitted) ("[T]he Second Circuit has determined that a pretrial detainee's Sixth Amendment rights are infringed upon when prison regulations 'unjustifiably obstruct', 'infringe', 'unreasonably burden', or 'significantly interfered' with the detainee's access to counsel."); *United States v. Chaves*, 902 F.2d 259, 266 (4th Cir. 1990) ("[It] is well settled that some showing of prejudice is a necessary element of a Sixth Amendment claim based on the invasion of the attorney-client relationship.").

For example, *Carr* addressed the issue of whether "the capability of the jail to monitor conversations [including those with counsel] through the use of intercoms, video cameras and other recording or listening devices" violated the plaintiff's Sixth Amendment rights. *Carr*, 2009 WL 1514661, at *33. The court held that the plaintiff failed to assert unreasonable interference with his right of access to counsel because the jail's ability to monitor conversations, including those with counsel, served an important penological interest of deterring criminal activity, and because the plaintiff had other "avenues for confidential communication with counsel in writing or with in-person conferences at jail." *Id.* The court also noted that the plaintiff failed to demonstrate any evidence of prejudice. *Id.*

Similarly, here, the cameras in the interview booths at the RCCC, as mentioned *supra*, serve the important purpose of addressing security-related concerns. More importantly, despite the presence of cameras in the interview booths, detainees at the RCCC can still engage in confidential communications with counsel. Due to the City's masking technology, detainees can sit in the pre-designated privacy zone without having any of their audio or visual communications

-13-

with counsel monitored or recorded.[6]  In addition, Plaintiffs have failed to provide any evidence of prejudice to detainees if the New Plan were to be implemented properly.

In response, Plaintiffs attempt to argue that the masking technology does not render the New Plan compliant with the Sixth Amendment because the City "cannot be trusted to properly employ and monitor any use of the masking technology," particularly given its previous instances of non-compliance with this Court's Orders.  (Pls.' Opp'n. to Defs.' Mot. ("Pls.' Opp'n"), ECF No., 138, at 22–23.)  However, barring evidence that the masking technology is ineffective, the City's credibility (or whether Plaintiffs have confidence in the City's representations regarding its New Plan) is not determinative of the Constitutional question at issue.  Rather, as the Second Circuit and other courts have clearly provided, the question is whether the City's New Plan, as provided, unjustifiably obstructs or otherwise prejudices a detainee's access to counsel.  And here, for the reasons stated *supra*, the City's proposed use of video recordings, without sound, plus masking technology does not significantly interfere with or otherwise prejudice detainees' access to counsel.

In the alternative, Plaintiffs argue that even if the City could be trusted to employ the masking technology properly, the New Plan still infringes on the right to private attorney communications because the "masked" area in the booths is small, and, as a result, there is a risk that a detainee's gestures may still be recorded.  (*Id.* at 23–24.)  However, the mere risk that communicative gestures outside of the "masked" area may be recorded does not rise to the level of a constitutional violation.  According to the City, the privacy zone in the booths will be clearly demarcated on the floor, and there will be signs posted in the booths to remind the detainee of

---

[6] Plaintiffs' citation to *United States v. Elzahabi*, 2007 No. 04-282, 2007 WL 1378415, at *2 (D. Minn. May 7, 2007) is not controlling here as the case never addressed the constitutionality of a video surveillance system that does not record audio and employs masking technology.

where to sit. (Defs.' Mot. at 7.)  Furthermore, an attorney meeting with his or her client in the booth could simply recommend that the detainee not make broad gestures outside of the privacy zone during their meeting.  Again, as made clear by the Second Circuit and the Supreme Court, the Sixth Amendment does not require a pre-trial detainee to be provided with the utmost privacy and freedom in interacting with his or her attorney.  Rather, what is required is for the detainee to have access to counsel, free from measures that substantially interfere with such access or prejudice the detainee.  *See Fraser*, 264 F.3d at 187 (reiterating that violations of the Sixth Amendment must be evaluated in light of the central objective of prison administration); *Wolfish*, 441 U.S. at 547 (same).

Plaintiffs argue that the supposed chilling effect from the obvious presence of video cameras itself constitutes a Constitutional violation.  (*See* Pls.' Opp'n at 23.)  However, the relevant inquiry here is whether the New Plan, as proposed, unjustifiably obstructs or significantly interferes with access to counsel.  *See Fraser*, 264 F.3d at 187.  It is not whether a detainee has the subjective impression or belief that the New Plan does or will interfere with such communications (*e.g.*, that the camera might be recording audio communications with counsel).  By using video-

only cameras, plus masking technology, the City's New Plan will only be recording video footage of an obvious pre-designated area, without recording any audio, or facial or physical expressions.[7]

## C.  This Court's October And November Orders Are Dissolved

Because this Court's October and November Orders were issued before the City proposed its masking technology,[8] and because the City's New Plan meets the requirements of the 1999 Settlement and the Sixth Amendment, Defendants' request to dissolve those two Court Orders is GRANTED.[9]  However, the findings in the instant decision apply strictly to the New Plan in its current proposed form.  Accordingly, while the City may implement video-only recording with masking technology in accordance with the New Plan, the 1999 Settlement, and the instant decision, Defendants are otherwise still prohibited from making video or audio recordings of attorney-client communications without masking technology, or implementing less private alternatives without prior approval of the Court.

## IV.  PLAINTIFFS' MOTION FOR CONTEMPT IS DENIED

Plaintiffs' contempt motion is DENIED because Defendants were only temporarily, and are no longer, in violation of this Court's October and November Orders.  Furthermore, this Court

---

[7] Nevertheless, the use of cameras is not the only way to address the City's security concerns.  It is also possible that those concerns could be addressed by other measures, such as the use of remote-controlled door locks, for example.  Plaintiffs have provided (and Defendants do not dispute) that there are other facilities in the City that use locks to address security-related concerns.  (*See* Pls.' Opp'n at 16.)  There is some indication that locks and restricted access to the booth when counsel is not present would also provide effective security in the interview booths at the RCCC.  (*Id.*)

[8] The City began experimenting with the masking technology on November 20, 2015 (Defs.' Opp'n at 4–5.)

[9] Although this Court finds that the New Plan satisfies the requirements of the 1999 Settlement and Sixth Amendment, it makes no findings regarding state and local regulations and whether they require visual monitoring of visits between detainees and counsel, as the Defendants have argued.  (*See* Defs.' Mot. at 9.)

is not persuaded that Defendants were not reasonably diligent in attempting to comply with the Orders.

A party may be held in civil contempt for failure to comply with a court order if: "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (internal citation omitted). It is well established that the chief purpose of civil contempt "is to compel obedience to an order of the court to enforce the rights of the other party to the action. Consistent with this remedial purpose, the sanction imposed is generally made contingent on compliance." *Armstrong v. Guccione*, 470 F.3d 89, 101 (2d Cir. 2006). Thus, a civil contemnor many generally "purge himself of contempt at any time by compliance." *Id.*; *see S.E.C. v. Sloan*, 535 F.2d 679, 680 (2d Cir. 1976) (holding that no live controversy remained for purposes of an appeal from an order of civil contempt because contemnor had purged himself of the contempt). Civil contempt may also be imposed to compensate a party that has been wronged so long as actual loss is proven. *GE Med. Sys. Info. Tech., Inc.*, 369 F.3d at 658. However, civil contempt "sanctions may *not* be imposed as a purely punitive measure." *Id.* at 657 (emphasis added).

Here, despite the City's admitted violations of this Court's October and November Orders, holding the City Defendants in civil contempt would be purely punitive, and contrary to the very purpose of this remedy, because the City Defendants have purged themselves of any violation. Defendants have represented, and Plaintiffs do not dispute, that as of March 2017, the City has taken extensive measures to make sure that the cameras in the interview booths at the RCCC cannot

be activated again, pending an order by this Court. (Defs.' Opp'n to Pls.' Mot. ("Defs.' Opp'n"), ECF No. 107, at 6.)

As of March 2017, the wiring for all cameras in the interview booths at the RCCC has been disconnected, with the disconnected wires "capped with red tape and a copy of the TRO . . . posted on the cabinet door to the network switchboard." (*Id.*)  Furthermore, the cable in the back of each camera in the camera housing unit in each interview booth has been since disconnected, with all of these wires also capped with red tape.  (*Id.*)  The City has also since modified its internal processes and procedures so that it can identify and resolve problems related to the unintended activation of the cameras in the future, which includes a weekly manual check to confirm that the cameras remain disabled pending further action by this Court.  (*Id.*)  In light of these measures that evidence the City's good-faith compliance with this Court's October and November Orders, and Plaintiffs' failure to allege any actual loss suffered as a result of the City's admitted prior violations, it would be purely punitive, not coercive, for this Court to find the City Defendants in contempt.  Therefore, Plaintiffs' motion for contempt is DENIED.[10]

Even if sanctions in this case would be proper, this Court would still deny Plaintiffs' motion for contempt because the evidence does not demonstrate that the City Defendants were "not reasonably diligent in attempting to comply" with this Court's Orders.  The relevant time period for assessing the City Defendants' compliance with this Court's Orders is between October 30, 2015, the date this Court temporarily enjoined *all* video surveillance, and the present.  Although this Court's Oct. 30 Preliminary Injunction Order expired on January 28, 2016 (ninety days after the Order pursuant to the PLRA), Plaintiffs have pointed out, and Defendants do not dispute, that

---

[10] Contrary to what the Plaintiffs allege, a finding of contempt on the basis of the 1999 Settlement is not warranted since the settlement the City Defendants allegedly failed to comply with was not "clear and unambiguous" with respect to the use of cameras.  The settlement makes no mention of cameras.  *See* discussion *supra* Section III.A.

during the parties' settlement discussions, which began in November 2015 with this Court's Nov. 4 Order, Defendants gave multiple assurances that they would not reactivate the cameras "until the matter was settled." (Luongo Aff. ¶ 9.) As such, Defendants essentially agreed and stipulated on their own volition that this Court's Nov. 4 Order—so-ordering the parties' stipulation that Defendants would refrain from any use of the video cameras in the RCCC interview booths— would remain in effect indefinitely, until this Court made a final determination with respect to the issue.

Since October 30, 2015, the City Defendants have violated this Court's October and November Orders by activating the cameras on several occasions: in November 2015, May 2016, and September 2016. (Pls.' Reply, ECF No. 119, at 2.) However, in all such instances, the cameras were activated inadvertently, and not with the intent of violating this Court's Orders. (Defs.' Opp'n at 4–6.). While willfulness need not be established for purposes of finding contempt, technical and/or inadvertent violations are factors to be considered in deciding a motion for contempt. *See, e.g., A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 289–90 (S.D.N.Y. 2000) (denying motion for civil contempt based on the finding that the violation in question was "inadvertent" and "promptly cured"). For every instance in which a violation was discovered, the City Defendants responded immediately by disabling the cameras. (*Id.* at 5–6.)

Thus, in exercising the wide discretion to determine whether to hold a party in contempt, this Court denies Plaintiffs' motion for contempt because the evidence against the City Defendants is insufficient to warrant a finding that they were not reasonably diligent in attempting to comply with this Court's Orders.

## IV.    CONCLUSION

Defendants' motion for declaratory relief, finding that the City's proposed plan for the use of video cameras with masking technology is legally sufficient, is GRANTED.  This Court's October 30, 2015 and November 4, 2015 Injunctive Orders are dissolved.  Plaintiffs' motion to maintain and modify those Orders to require the removal of all surveillance cameras from the attorney-client interview booths in the RCCC, and to hold Defendants in civil contempt is DENIED.

The Clerk of Court is directed to close the motions at ECF Nos. 100 and 130.

Dated: February 26, 2018
       New York, New York

SO ORDERED.

_George B. Daniels_
GEORGE B. DANIELS
United States District Judge